F. F. SLOCOMB & CO., Inc., v. A. C. LAYMAN MACH. CO.

(District Court, D. Delaware. January 30, 1915.)

No. 312.

1. PATENTS &⇒259—"CONTRIBUTORY INFRINGEMENT"—SALE OF REPAIRS TO OWNERS OF PATENTED MACHINES.

The furnishing of repair parts to the owner and user of a patented machine, where the repairs do not amount to a reconstruction, and in the absence of any express limitation in the contract by which the machine was sold, does not constitute a "contributory infringement" of the patent.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 400–402; Dec. Dig. &⇒259.

For other definitions, see Words and Phrases, First and Second Series, Contributory Infringement.]

2. PATENTS &⇒255—INFRINGEMENT—REPAIR OR RECONSTRUCTION OF MACHINE.

The purchaser of a patented machine is entitled to make necessary repairs and to replace worn-out parts, not separately patented, so long as the identity of the licensed machine is not destroyed; and what he may do himself another may do for him without being chargeable with infringement.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 397, 399; Dec. Dig. &⇒255.]

&⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. PATENTS ⬅259—CONTRIBUTORY INFRINGEMENT—FURNISHING REPAIRS FOR PATENTED MACHINE.

The furnishing by defendant of repair parts to users of patented machines made and sold by complainant, of small value severally, to replace parts subject to wear, and which in numerous instances were purchased by defendant from complainant at customary prices, *held* not to constitute contributory infringement.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 400–402; Dec. Dig. ⬅259.]

4. PATENTS ⬅328—VALIDITY AND INFRINGEMENT—LEATHER-STAKING MACHINE.

The Craig & Slocomb reissue patent, No. 11,843, for a leather-staking machine, *held* valid, but not infringed.

5. PATENTS ⬅167—CONSTRUCTION—CLAIM FOR COMBINATION.

Where a claim of a patent is for a combination, to be valid, it must be for an operative combination, and if an element essential to make it operative is shown and described in the specification and drawings, but is omitted from the claim, it must be read into the latter.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 243; Dec. Dig. ⬅167.]

6. PATENTS ⬅246—INFRINGEMENT—COMBINATION.

Each of the parts whose co-operative action is necessary for the performance of the function of a mechanical combination claimed is an essential element of such combination, and a combination which does not contain it, or its equivalent, is not an infringement.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 387; Dec. Dig. ⬅246.]

7. PATENTS ⬅328—VALIDITY AND INFRINGEMENT—LEATHER-STAKING MACHINE.

The Slocomb patent, No. 927,609, claims 4 and 5, for a leather-staking machine having a rotatable breast roll with manually operated devices for unlocking and locking it in different positions while the machine is in motion, *held* not infringed.

In Equity. Suit by F. F. Slocomb & Co., Incorporated, against the A. C. Layman Machine Company. On final hearing. Decree for defendant.

See, also, 201 Fed. 101.

E. Hayward Fairbanks, of Philadelphia, Pa., for complainant.

Charles Howson and William Steell Jackson, both of Philadelphia, Pa., for defendant.

BRADFORD, District Judge. The bill charges infringement of reissue patent of the United States No. 11,843, granted July 31, 1900, and United States patent No. 927,609, granted July 13, 1909. Both patents were assigned to and are owned by the complainant. No. 11,843 was granted to James Craig and Frank F. Slocomb for an improvement in leather-staking machines, and No. 927,609, hereinafter referred to as the breast roll patent, was granted to Frank F. Slocomb for a leather-staking machine table. The charge of infringement with respect to the reissue patent has been restricted to claims 1, 2, 3, 4, 5, 6, 13, 19, 21 and 23, which are as follows:

"1. In a leather-staking machine, a plurality of rollers mounted on a jaw thereof, and means for enabling one of said rollers to be raised or lowered independently of the other roller.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"2. In a leather-staking machine, a plurality of rollers mounted on a jaw thereof, means for enabling one of said rollers to be raised and lowered independently of the other, and means for varying the distance between said rollers.

"3. In a leather-staking machine, an upper jaw, a lower jaw, a blade carried by said lower jaw, a roller mounted in bearings attached to said upper jaw, adjustable arms carried by said upper jaw, stems adjustably supported in said arms, means for securing said stems in their adjusted positions and a roller having bearings in said stems.

"4. In a leather-staking machine, an upper jaw, a roller mounted in suitable bearings attached to said jaw, adjustable arms carried by the latter, said arms supporting adjustable threaded stems, and a roller having bearings in said stems.

"5. In a leather-staking machine, an upper jaw, a roller journaled thereupon, arms adjustably mounted on said jaw, adjustable stems supported by said arms, and a roller journaled in said stems.

"6. In a leather-staking machine, an upper jaw having a plate attached thereto, a roller journaled in bearings depending from said plate, slotted arms having a cross-piece attached thereto, means for securing said arms to said plate, bearings capable of vertical adjustment depending from said arms, and a roller journaled in said bearings."

"13. In a leather-staking machine, an upper and lower jaw, a roller mounted in suitable bearings attached to said upper jaw, adjustable arms carried by the latter, stems adjustably supported in said arms, and a roller having bearings in said stems, in combination with a plurality of upright blades attached to said lower jaw, one of said blades occupying the space between said rollers when said jaws are in their forward position."

"19. In a leather-staking machine, upper and lower jaws pivotally supported, a blade carried by said lower jaw, a roller mounted in bearings attached to said upper jaw, arms carried by the latter, stems adjustably supported in said arms, means for locking said stems in position and a second roller having bearings in said stems."

"21. In a leather-staking machine, in combination with the jaws thereof, mechanism for reciprocating and opening and closing said jaws, and laterally-movable means for adjusting said jaws, said means being controlled and operated by the knee of the attendant."

"23. The combination with the jaws of a leather-staking machine, of mechanism for reciprocating and opening and closing said jaws, and laterally-movable means for adjusting one of said jaws, said means being located below said jaws."

With respect to the breast roll patent the charge of infringement has been restricted to claims 4 and 5, which are as follows:

"4. The combination with a staking machine, of a breast roll rotatably mounted thereon, and means to lock said roll.

"5. In combination with a staking machine, a breast roll rotatably mounted thereon, and means to lock said roll in different positions."

[1] The complainant in the bill as amended charges the defendant with direct infringement in manufacturing, using and selling leather staking machines embodying the inventions described and claimed in the two patents in suit, and also with contributory infringement in furnishing and supplying repair parts to owners and users of such leather-staking machines for the purpose and with the intent that such repair parts should be united with other elements to complete the combinations claimed in the said patents. The bill does not allege that the defendant furnished repair parts to persons other than those owning and using staking machines manufactured and sold by the complainant under the patents in question, nor that the repair parts

were separately patented. Nor is there any evidence showing or tending to show that repair parts were furnished by the defendant to persons not owning and using the machines to which they were applied. Nor has it been shown that the repair parts were furnished and supplied by the defendant with any actual intent to defraud or wrongfully injure the complainant in the enjoyment of its patent monopoly unless the furnishing of such repair parts per se gives rise to the presumption of such wrongful intent. The facts do not present a case in which an alleged contributory infringer supplies repair parts to those using the patented mechanism without authority and wrongfully. The parts so furnished by the defendant were procured by the owners of the patented mechanism in order that they might not lose the beneficial enjoyment of the machines which they had a right to operate. The owners and users of the complainant's patented machines had a right to restore them to and maintain their efficiency by making from time to time suitable repairs not amounting to reconstruction. This right in the absence of a stipulation to the contrary was vested in them and not in the complainant. Morgan Gardner E. Co. v. Buettner & Shelburne M. Co., 203 Fed. 490, 121 C. C. A. 612; Wagner Typewriter Co. v. F. S. Webster Co. (C. C.) 144 Fed. 405. If the purchaser and user of the complainant's machines cannot, in the absence of a stipulation to the contrary, remedy defects resulting from their operation by making repairs falling short of reconstruction, he is at the mercy of the patent owner who can prevent him from enjoying their use by means of making such repairs and thus compel him, if he intends to use such machines at all, to purchase new ones from the holder of the patent monopoly. This would in most cases largely destroy the beneficial use of the machine, in contemplation of the purchaser at the time of buying and serving as a consideration for the purchase. The charge of contributory infringement is based upon the furnishing by the defendant to purchasers and users of the machines of the patents in suit from time to time of various repair parts. The furnishing of these repair parts is treated by the complainant as amounting to a reconstruction of the patented combination mechanism.

[2] The defendant, however, contends that the parts so furnished by it to such purchasers and users of the complainant's machines and their application thereto did not in any sense constitute reconstruction, but simply renewal by supplying repair parts not separately patented which in the course of time from the operation of the mechanism became worn out or otherwise defective. The solution of the question whether the furnishing of particular parts of patented mechanism will amount to reconstruction and consequently an invasion of the exclusive rights of the patentee is often attended with much difficulty. Much loose language has been employed on this subject. It has been said that the furnishing of a vital feature or part of a patented mechanism, when essential to its construction and operation for the accomplishment of the ends for which it is intended, will amount, if unauthorized by the patentee, to a wrongful reconstruction. But this cannot be sound as a general rule. The wearing out or breaking of a

screw or bolt will as effectually prevent the operation of the mechanism as the destruction of a larger and more expensive feature. The wearing out or breaking down of a particular part essential to the operation of the mechanism therefore cannot be relied on as furnishing the test whether reconstruction, or merely repair or renewal, is required. It is claimed by the complainant's counsel that the repair parts furnished to the owners and users of the patented machines were "to a certain extent of a non-perishable character," and that all of them were "substantially non-perishable." If the parts of the mechanism replaced by the repair parts furnished by the defendant were "substantially non-perishable" I fail to perceive why they should have been replaced, unless the owners and users of the machines desired to throw away their money in paying the defendant for repair parts of which there was no need. It is more reasonable to conclude that repair parts were bought from the defendant because the owners and users of the machines found there was need of them for the operation or efficient operation of the patented mechanism. If there was such need it was owing to the wear or breaking of the parts to be replaced. Due consideration of the facts in any given case should be determinative of the rightfulness of supplying or applying repair parts, not separately patented, to a patented mechanical combination. If, by way of illustration, patented mechanism be composed of various parts and elements the most expensive of which have an average life of twenty years, and other parts or features of comparatively trifling cost are subjected in the operation of the mechanism to such wear as to require renewal or replacement within a period of a few months, or of a year or two, it would seem reasonable and sensible to treat such renewal or replacement as involving repairs in contradistinction to reconstruction. In Wilson v. Simpson, 9 How. 109, 13 L. Ed. 66, the court said:

"We admit, for such is the rule in Wilson v. Rousseau, 4 How. [646, 11 L. Ed. 1141], that when the material of the combination ceases to exist, in whatever way that may occur, the right to renew it depends upon the right to make the invention. If the right to make does not exist, there is no right to rebuild the combination. But it does not follow, when one of the elements of the combination has become so much worn as to be inoperative, or has been broken, that the machine no longer exists, for restoration to its original use, by the owner who has bought its use. When the wearing or injury is partial, then repair is restoration, and not reconstruction. Illustrations of this will occur to any one, from the frequent repairs of many machines for agricultural purposes. Also from the repair and replacement of broken or worn out parts of larger and more complex combinations for manufactures. In either case, repairing partial injuries, whether they occur from accident or from wear and tear, is only refitting a machine for use. And it is no more than that, though it shall be a replacement of an essential part of a combination. It is the use of the whole of that which a purchaser buys, when the patentee sells to him a machine; and when he repairs the damages which may be done to it, it is no more than the exercise of that right of care which everyone may use to give duration to that which he owns, or has a right to use as a whole. * * * The right to repair and replace in such a case is either in the patentee, or in him who has bought the machine. Has the patentee a more equitable right to force the disuse of the machine entirely, on account of the inoperativeness of a part of it, than the purchaser has to repair, who has, in the whole of it, a right of use? And what harm is done to the patentee in the use of his right of invention, when the repair and replacement of a partial injury are confined to the machine which the purchaser has bought? * * *

The proof in the case is, that one of Woodworth's machines, properly made, will last in use for several years, but that its cutting-knives will wear out and must be replaced at least every sixty or ninety days. The right to replace them was a part of the invention transferred to the assignee for the time that he bought it, without which his purchase would have been useless to him, except for sixty or ninety days after a machine had been put in use. * * * The right of the assignee to replace the cutter-knives is not because they are of perishable materials, but because the inventor of the machine has so arranged them as a part of its combination, that the machine could not be continued in use without a succession of knives at short intervals. Unless they were replaced, the invention would have been but of little use to the inventor or to others. The other constituent parts of this invention, though liable to be worn out, are not made with reference to any use of them which will require them to be replaced. These, without having a definite duration, are contemplated by the inventor to last so long as the materials of which they are formed can hold together in use in such a combination. No replacement of them at intermediate intervals is meant or is necessary. * * * But if another constituent part of the combination is meant to be only temporary in the use of the whole, and to be frequently replaced, because it will not last as long as the other parts of the combination, its inventor cannot complain, if he sells the use of his machine, that the purchaser uses it in the way the inventor meant it to be used, and in the only way in, which the machine can be used."

If the purchaser and user of a patented machine has a right personally to keep it in repair manifestly he equally has a right through the instrumentality of a third person to do the same thing. If, for instance, the rubber cover of a roll through continued use needs replacement, repair or renewal by way of repair of the patented machine in which it is used, and it be permissible for the owner of the machine to make such repair or renewal, without accountability to the patent holder, it is equally permissible for a third person, whether manufacturer or mechanic, to effect such repair or renewal without such liability. Whether the defendant by way of advertisement or otherwise solicited from the purchasers and users of the complainant's machines the business of supplying repair parts, or, without solicitation, remained inactive until called on for repair parts by such purchasers and users, is wholly immaterial. In Morrin v. Robert White Engineering Works, 143 Fed. 519, 74 C. C. A. 466, the circuit court of appeals for the second circuit said:

"The theory of the rule invoked by the complainant is that a patentee of a combination cannot be deprived of his gains and profits by the conversion of an old and defunct machine under the guise of repairs. If a new machine be needed the patentee is entitled to furnish it, but, on the other hand, the purchaser of a patented machine is entitled to make necessary repairs and to replace worn out parts, not separately patented, so long as the identity of the licensed machine is not destroyed. If this be lawful for the owner, it is equally so for the mechanic who is employed to do the work; the latter cannot be held as an infringer for making repairs which the former has an undoubted right to make."

[3] The question then is whether the repair parts, the furnishing of which by the defendant is complained of, were not such as could, in the absence of a stipulation to the contrary, properly be furnished by purchasers and users of the patented machines by way of repair in contradistinction to reconstruction. On this point I have little or no doubt, in view of the character of the repair parts and of the attitude

of the parties toward them. There are in evidence receipted bills from the Baker Machine Company to the defendant or its president for repair parts for machines manufactured under the patents in suit running through a period extending from and including March 7, 1908, to and including October 30, 1911, and embracing many items, no one of them costing more than $3, excepting a connecting-rod, a cam head and a roll, costing, subject to a discount, respectively $9, $3.50 and $3.85. The complainant's president, F. F. Slocomb, in his testimony expressly recognizes that the repair parts are subject to wear, and intended to be replaced from time to time. He states that the "defendant has furnished practically all the parts of our machine which are subject to wear," and further, that "as I have testified that the parts referred to wear 'for several months or possibly a year or over on the average,' I certainly had no intention to indicate that the parts in question were not wear parts or were not intended and expected to be worn out and replaced at intervals." The witness arbitrarily fixes upon "one month as the limit in time for which a part of a machine that could be called temporary or perishable would ordinarily wear." But such a limitation is not supported by reason or authority. The bill as originally filed December 2, 1911, contained no charge of contributory infringement, nor does the evidence show that the furnishing by the defendant of repair parts to the machines of the patents in suit was protested against on the part of the complainant as constituting contributory infringement until after the lapse of more than eight months after the filing of the bill, during the taking of testimony of A. C. Layman, president of the defendant. Yet the complainant knew that the defendant had for several years prior to the filing of the bill been engaged in the business of supplying repair parts to purchasers and users of the machines of the patents in suit. In fact the complainant furnished to the defendant during a considerable period prior to the filing of the bill at customary prices and on usual terms such or similar repair parts for the purpose of being so applied to such machines. There are in evidence receipted bills from the complainant, bearing the stamped initials of its president, to the defendant or its president, for repair parts for such patented machines running through a period extending from and including January 24, 1908, to and including January 7, 1909, and embracing a number of items, none of them costing more than $3.75, with the exception of a pressure bed costing $6. The complainant knowing for a considerable period that the defendant was furnishing repair parts for machines owned and operated by purchasers from the complainant, and in fact furnishing to the defendant at normal prices such repair parts for the purpose of being so supplied to such machines, pursued a course of action negativing the existence of any idea on its part that the furnishing by the defendant of such repair parts amounted or would amount to a reconstruction of the patented combination mechanism, in contradistinction to the renewal by way of repair of the particular elements or features represented by such repair parts. For it is unreasonable to assume, in the absence of an agreement to that end between the complainant and the defendant, that the former intended by its action to abandon or forego its patent monopoly to the extent of reconstruction. It is to be gathered

from the evidence that the cause of the friction and controversy between the complainant and the defendant was not the mere furnishing of repair parts by the latter which the former had countenanced and facilitated, but the fact that the defendant was placing or about to place on the market a piece of mechanism intended to compete with the staking machine of the patents in suit. The charge of contributory infringement with respect to the furnishing of repair parts savors too strongly of an afterthought, and I am unable to sustain the bill on that ground.

[4] Claims 1 to 6 of the reissue patent relate more especially to improvements in the staking devices on the forward portion of the upper jaw of the combination mechanism; claims 13 and 19 to the lower jaw and staking devices on the upper jaw; and claims 21 and 23 to means to be operated laterally by the operator for adjusting the pressure of one of the above mentioned jaws while the machine is in operation, and without stopping the same. I think the reissue patent is valid, though not for a pioneer or broad invention. The real question touching the patent is whether on a proper construction of the claims the defendant has infringed. It is more convenient to consider the charge of infringement first with respect to claims 21 and 23. The distinctive and dominating element in each of those claims is the "laterally-movable means" for regulating the pressure of the staking devices upon the skins, through an adjustment of the jaws with respect to each other. To ascertain the character of the laterally-movable means recourse must be had to the description. There, among other things, it is said:

"Our invention consists of an improved construction of leather-staking machine whereby we are enabled to effect an exact and delicate adjustment of pressure on the leather which is being staked while the machine is in motion. * * * It also consists of novel means for effecting the adjustment of the staking-jaws while the machine is in motion, at the same time enabling the operator to stand on both feet, as well as to effect the adjustment with accuracy and precision not heretofore attainable, and in addition permitting him to release the adjusting device instantly instead of being compelled to hold it in position. * * * The upward and downward movement of the jaw $7^x$ can be adjusted with great exactness during the operation of the machine without stopping the latter by the operator oscillating in a lateral direction to the desired extent the knee-piece $66^x$. (Seen in Figs. 1 and 8.) The desired lateral oscillation is imparted by the knee of the operator, whereby the contact of the inclined or cam surfaces will cause the table or bed $42$ to be raised or lowered. * * * The foot-treadles heretofore in use for adjusting the pull or pressure on machines of this class while in motion have been fundamentally imperfect and objectionable in that they necessitated the attendants maintaining a continual pressure. In practice the effect of this has usually been so fatiguing that the operator is found to depress the treadle constantly to the floor or other stop in order to support his weight on both feet. Obviously the result of this has been to make the treadle, instead of a means of regulating the pressure, merely a device for applying it. With our swiveling or laterally-movable device the pressure is not only applied, but regulated with great accuracy and precision, and the operator can change the pressure with each skin, as he should do, instantly, and without the slightest fatigue or interruption to his work, and the frictional adjusting device holds the swivel just where it is placed, being capable of adjustment, so that the swivel shall not change position on account of any vibration of the machine, nor, on the other hand, move so stiffly as to require any exertion of force. It will further be apparent that were the treadle motion not fatiguing

it would still be objectionable on the ground that it does not admit of accuracy, because it is evidently impossible for the attendant to control the motion of one foot with anything approaching precision even for a short time while compelled to balance his weight on the other foot."

I am clearly of opinion that even without reference to the proceedings in the patent office the mechanism of the defendant complained of does not infringe either claim 21 or claim 23 of the reissue patent. The former claim expressly contemplates and requires that the "laterally-movable means" constituting an element of the combination should be "controlled and operated by the knee of the attendant," and the latter claim by necessary implication, though not expressly, requires the same thing. The patent description not only expressly requires it but gives the reasons necessitating such requirement. The element has for its purpose "effecting the adjustment of the staking-jaws while the machine is in motion, at the same time enabling the operator to stand on both feet, as well as to effect the adjustment with accuracy and precision not heretofore attainable." It appears from the evidence beyond successful contradiction that it would be wholly impracticable to adjust the staking jaws or either of them while the machine is in motion by the use of the hand or foot of the operator. The withdrawal of a hand from the guiding and manipulation of the skin would prove disadvantageous or disastrous. Slocomb says:

"The operator cannot use his hand for adjusting the mechanism without stopping working on the skin while he is doing so. This is not the case if he uses his knee. * * * Where hand adjustment has been used instead of the knee, instructions have at once been given to use the knee exclusively."

So, if the operator were to use a foot for the operation of the "laterally-movable means," he would be rendered too unsteady to make proper use of the breast roll and to efficiently handle the skins between the staking jaws. The defendant's machine does not contain the laterally-movable means of claims 21 and 23 of the reissue patent, in that it discloses no "knee-piece" or anything equivalent to it. On the contrary, the mechanism for the adjustment of the staking jaws of the defendant's machine displays the very feature studiously sought to be avoided by the reissue patent. Slocomb has given some vague, loose and unsatisfactory testimony touching the feasibility or possibility of using the knee or the hand in the rotation of the adjustment wheel of the defendant's machine. He states:

"I have never attempted to operate any of the defendant's machines. In fact, I do not claim to be an expert at operating any staking machine. Moreover, my testimony with regard to the use of the hand or knee relates only to our own machines as I certainly would not presume to give any instructions with regard to any other make. * * * I have never seen anywhere any of the defendant's machines adjusted by the operator using his knee."

He also states that "the operator may also use his hand if he mistakenly wishes to do so in adjusting the pressure while the machine is in motion." And that he has seen an adjustment effected with the hand while the staking machine was in motion, "but it was of course impossible for the operator to continue staking a skin while moving with one hand the adjusting mechanism." He also states that "with the device shown in the defendant's drawing and used in his machine,

it is possible to swing the adjusting device with either the knee or the hand," and that he had "moved this adjusting mechanism with my knee, so that I am in a position to state that this adjustment can readily be made in that manner, should the operator wish to do so." But he admits that "at the time referred to, the machine was not in motion." Operating the defendant's adjusting wheel when the machine is at rest is one thing, and operating it when the machine is in motion under power is a very different thing. One can readily perceive that the adjustment wheel may be rotated while the machine is in motion by the hand, but not when a skin is in the process of being staked, for the witness states that it is "of course impossible for the operator to continue staking a skin while moving with one hand the adjusting mechanism." So it is quite conceivable that the adjusting wheel may be caused to rotate by the application of the knee in a constrained position, but that the knee in contradistinction to the foot may be used to advantage is obviously impossible from the form and construction of the mechanism. Slocomb has failed in his testimony to show that the use of the knee is a practical mode of operating defendant's adjusting mechanism. What the complainant claims to be the equivalent of the knee-piece in the machine of the reissue patent is a device called a wheel, placed under the table of the staking machine and considerably back of the breast roll, having radial spokes or rods and rotating in a vertical plane at right-angles with the staking jaws. While it is possible that the operator through bodily contortion might with the knee cause it to rotate to a certain extent, it cannot from its physical location and construction be actuated by the knee with any degree of efficiency. Certainly the attempt made in open court to operate it with the knee, when the machine was not operating upon a skin, was far from indicating that it could be so used to any advantage while the machine was in motion by one engaged in holding, guiding and manipulating the skins in process of staking. The witness Layman speaks much to the point when he says:

"There is no doubt by getting under the machine purposely for operating it with his knee that it could be done as well as with his shoulder or his head or his hands, but certainly no operator could possibly operate this wheel with his knee and at the same time hold the skin with both hands while the machine is pulling on it."

He further says:

"I have never seen nor even heard of the workman or operator using his knee in operating this wheel on our machine."

The only practical mode of using the adjustment wheel of the defendant's machine while in operation is by foot pressure of sufficient force to cause the wheel to rotate to the desired extent. This is diametrically opposed to one of the principal purposes of the reissue patentees, which was to enable the operator while the machine is in motion to "stand on both feet." As has been shown, foot pressure by the operator is expressly and pointedly condemned in the description, it being stated, among other things, that "it is evidently impossible for the attendant to control the motion of one foot with anything approaching precision even for a short time while compelled to balance his

weight on the other foot." Not only is such a device as the defendant's adjustment wheel repudiated by the reissue patentees, but that wheel is more nearly allied to the old foot treadles than to the "laterally-movable means" of adjustment in the complainant's machine. The laterally-movable means of adjustment undoubtedly was a meritorious invention possessing novelty and utility, but it has not been infringed by the defendant. The expert Livermore well says:

"When regarded as elements of the mechanism under consideration obviously defendant's vertical wheel adapted to be operated practically when the work is going on only by the foot of the operator when off the floor is not an equivalent for the horizontal segment of the Craig & Slocomb machine, an essential and specified characteristic of which is that it is laterally movable and this being for the purpose of enabling it to be practically and conveniently operated by the knee of the attendant, while standing with both feet on the floor."

[5, 6] Nor do I find that the defendant has infringed the other or any of the other claims of the reissue patent relied on by the complainant in this case. As before stated, claims 1 to 6 relate more especially to the staking devices on the forward portion of the upper jaw of the combination mechanism, and claims 13 and 19 to the lower jaw, and staking devices on the upper jaw. All the claims above specified evidently are intended to cover mechanical combinations, but are so general, indefinite or incomplete in and by themselves as not plainly to disclose the construction or operation of the mechanism to which they relate. They must, therefore, be viewed in the light of the patent description and drawings. That a mechanical device literally falls within the language of a patent claim does not necessarily show that it is covered by the claim. And where the claim is for a combination, to be valid it must be for an operative combination, and if an element essential to make it operative is shown and described in the patent description and drawings, but is omitted from the claim, it must be read into the latter. Each of the parts whose co-operative action is necessary for the performance of the function of the mechanical combination claimed is an essential element of such combination and must have been employed without authority in connection with the rest before infringement can be found. The facts here do not disclose the case of mere subcombinations, each having its proper function in assisting to bring about the contemplated general result of the operation of the patented mechanism in its entirety, and not so related to or dependent upon the other parts or subcombinations as to have its appropriate and distinctive function qualified or modified by their action. On the contrary, without going into details, the knee adjusting mechanism or "laterally-movable means" for the adjustment of the jaws and consequent regulation of the pressure on the skins is so related in its operation to that of the mechanism mentioned in the above specified claims as to qualify and control its action and constitute an essential element of the combinations. It is not enough that the defendant may through its machine reach the same result as that obtained by the complainant. To constitute direct in contradistinction to contributory infringement of any combination claim relied on in the reissue patent it is necessary that the defendant's mechanism should

contain elements the same as or equivalent to all the essential elements, whether expressed or implied in the combination claim, contained in the complainant's machine co-operating in substantially the same manner to perform its function. Neither the laterally-movable means of jaw adjustment, or knee mechanism, an essential element of the complainant's machine, nor any equivalent element, is present in the defendant's machine; and the two are accordingly so differentiated from each other, not only with respect to the knee device, taken in and by itself, but also with respect to the construction and operation of the connected intermediate mechanism between it and the outer end of the lower jaw, due to such device, as to exclude infringement. The conclusion reached renders unnecessary the consideration of various other matters presented by way of defence.

[7] The objects of the breast roll patent No. 927,609 are stated in the description as follows:

"This invention relates to a machine for staking leather and has for an object to provide an operating table which may be readily moved out of the way when it is desired to repair or inspect the operating parts of the machine. It has for a further object to provide a staking machine with a breast roller on the working table, the position of which may be shifted at will, thereby bringing a large number of working faces successively into position."

The claims here relied on by the complainant relate to the latter of the above stated objects and, as before stated, are as follows:

"4. The combination with a staking machine, of a breast roll rotatably mounted thereon, and means to lock said roll.
"5. In combination with a staking machine, a breast roll rotatably mounted thereon, and means to lock said roll in different positions."

The patentee further says in the description:

"It is well known that in this type of machine such breast rollers soon become worn, due to the constant pressure exerted against the face thereof, and therefore it becomes necessary to shift the roller to bring another portion of the periphery into operative position. The customary method of shifting this roller involves the taking apart of adjacent portions of the machine in order to accomplish the desired end, causing delay and the loss of use of the machine during such shifting of the roller. By means of my novel improvement the machine is constantly in operation and a new surface brought into use whenever desired by simply withdrawing the bolt 28 from locking engagement with the spindle 24, whereupon the latter may be rotated as desired and the worn surface shifted out of the path of the skin."

In view of the length of time the breast roll of a leather-staking machine can be used before it becomes necessary or material by reason of wear to expose a different portion of the periphery to contact with the body of the operator, the mechanism of the two claims in suit is comparatively unimportant. I do not perceive that extreme celerity in exposing different portions of the surface of the breast roll during the operation of the machine is of much moment, or that a rotary adjustment of the breast roll while the machine is not in operation would not be of substantially equal benefit. If the invention covered by the two claims in question be patentable it is a narrow one. The position of the complainant is that Slocomb was the first to introduce in a leather-staking machine a rotatable breast roll with manually operated devices for unlocking it, permitting it to be rotated, and then locked again,

while the machine is in motion. The end to be accomplished by the rotation of the breast roll in any leather-staking machine is the avoidance as far as possible of unequal wear of the roll with its attendant evils. The normal status of the breast roll is not rotation, but rest. It is intended to be shifted by way of rotation from time to time in order that different portions of the periphery may be brought into such position as to be in contact with the body of the operator during the staking of the skins. Breast rolls for leather-staking machines not only were old in the art, but they were shifted by way of rotation to answer the same ends for which the complainant's breast roll is used. This was recognized by Slocomb in describing his invention as above appears. Prior to his patent now under consideration, breast rolls were used on leather-staking machines which were provided with hexagonal ends inserted into corresponding caps and held in position therein by means of bolts and nuts. In order to change the portion of the periphery exposed to contact with the body of the operator it was necessary to loosen the hexagonal nuts from the caps, involving the use of a wrench or some equivalent tool and the expenditure of more or less time. The breast roll of the complainant is locked against rotation by means of the insertion of a bolt, actuated by a spring, in one of a series of perforations located at intervals around the periphery of the spindle of the breast roll, and is unlocked by withdrawing by hand the bolt against the tension of the spring from the perforation with which it is engaged. In the defendant's mechanism the ends of the spindles are octagonal in form and mounted in hinged caps having a smooth circular inner surface, the lower end of the cap having an extension carrying a stud on the end of which is a wing-nut which can be manipulated by the fingers of the operator. A slight loosening of the wing-nut permits the breast roll to be readily rotated without stopping the machine, and so a slight tightening of the wing-nut by hand will cause the breast roll to be held stationary. The defendant's mechanism for permitting the breast roll to be rotated and then to be held stationary in such position as may be desired was at the time of the granting of the patent to Slocomb an old and familar mechanical device known as a shaft grip, illustrated in a book in evidence, published in 1890 by Thomas Walter Barber, entitled "The Engineer's Sketch Book of Mechanical Movements, Devices, Appliances, Contrivances and Details," on page 17, figure 54. The defendant's device for controlling the rotation of the breast roll more closely resembles the mechanism of the prior art than it does that of the complainant, and whatever merit may reside in the breast roll mechanism covered by claims 4 and 5 the defendant cannot, I think, be held as an infringer with respect to those claims by reason of adopting the old device.

On the whole I have reached the conclusion that the bill must be dismissed with costs. Let a decree be prepared accordingly and submitted.