**STANDARD STOKER CO., Inc., v. BERK-LEY MACH. WORKS & FOUNDRY CO., Inc.**

**No. 4477.**

Circuit Court of Appeals, Fourth Circuit.

Aug. 28, 1939.

Clifton V. Edwards, of New York City (D. Gordon Angus, of New York City, on the brief), for appellant.

Jo. Baily Brown, of Pittsburgh, Pa. (Victor A. Peckham, of Pittsburgh, Pa., and Roland Thorp, of Norfolk, Va., on the brief), for appellee.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

SOPER, Circuit Judge.

This appeal involved four patents relating to automatic stokers for coal-burning railroad locomotives. Plaintiff, who is the largest manufacturer of such stokers, has marketed two types, conveniently termed type A and type B. The general principles of both types of stokers are quite old and beyond the protection of any patents. The four patents in question are for specific parts in the construction of these stokers and for such specific parts in combination with other parts, as hereinafter explained.

The type A stoker consists of a horizontal conveyor screw, running in a trough beneath the locomotive's tender, whereby the coal is carried forwardly to a transfer hopper, from which the coal is raised by two vertical or elevator conveyor screws, and means for dispersing coal from the top of the vertical conveyor screws to within the fire-box. The vertical screws rise at an incline from each other from the forward end of the horizontal screw to points on each side of the fire door. Because there is such a vertical conveyor on each side of the fire door, this type of stoker is generally called the "Duplex" type. These are the principle features of this stoker, but, of course, there are many other parts such as casings for the conveyors and mechanical means for operating them.

This type A stoker operates in the following manner: The coal falls by gravity through an opening along the bottom of the tender upon the horizontal conveyor screw and is carried forward by its rotary action to a point at the rear end of the locomotive's boiler. Here the coal is forced upon the vertical conveyor screws which by their rotary action raise it to points on either side of the fire door. From the top of the elevator screws, the coal is blown by steam through some form of distributor tube or nozzle to all portions of the fire-box.

The plaintiff company constructed over 7,000 of these type A stokers, which are

still in use, but since 1931 it has manufactured almost exclusively the less complex type B stoker. There are approximately 4,000 of the latter in use on railroad locomotives.

The type B stoker resembles the type A in that it consists of a horizontal conveyor screw running in a trough beneath the tender, but the screw in the type B runs forward to a point beneath the firebed, and in place of the two vertical conveyor screws, there is a single unobstructed conduit or casing which forms an elbow at the forward end of the horizontal conveyor and rises thence vertically inside the boiler to a point above the fire. There are steam jets at the top of the vertical riser to scatter the coal over the fire.

The first patent is Lower patent No. 1,373,748. It calls for all the old principles and parts of a type A stoker with the single novel feature of an enlarged final flight or turn on the forward end of the horizontal conveyor screw. The purpose of the change is thus stated in the specification: "It is common practice for the fuel to be transferred from the tender to the locomotive by means of a screw conveyor working in a trough and conduit located below the tender floor and delivering to a chambered body carried by the locomotive, from which it is elevated by one or more similar screws. It is important to the efficient working of the elevating screws that the fuel be under pressure as it is taken up and carried forward by them, thereby reducing the frictional action upon it of the vane of the elevating screw. It is, nevertheless, desirable that there be a free movement of the fuel in the horizontal or transferring conduit." This patent is hereafter referred to as the "Duplex" patent.

The second patent is Lower patent No. 1,455,058 which also relates to type A stokers. This patent refers to the distributing tubes or nozzles through which coal is discharged by steam jets from the tops of the vertical or elevator screws into the firebox. The tubes extend from the upper ends of the elevator screws into the firebox and are provided with upper and lower forwardly projecting plates. The bottom plate has an upstanding traverse lip or abutment on its forward end with laterally opening recesses immediately back of this abutment. The object of the patent is to provide a means for scattering the coal throughout the firebox when it is shot through the tube leading from the top of the vertical screws. The upper strata of the coal passing through the distributor tube spreads out into a fan-shaped stream feeding the forward end and corners of the firebox; the lower strata strikes the abutment or lip on the forward end of the lower plate, bounces generally backward into the laterally opening recesses immediately back of the abutment, and rolls down these recesses as in a chute to the rear and rear corners of the fire box. This patent is hereafter called the "distributor tube" patent.

The third patent is Hunt patent No. 1,690,116 and relates to the type B stokers. The specification states: "In conveyors of this type and particularly those wherein the coal is moved beyond the end of the screw conveyor, upwardly through an unobstructed conduit to a point above the fire and is there distributed over the fire by steam jets, if the conveyor screw at its forward end has only a single thread or flight, the delivery of the total from the mouth of the conduit is intermittent rather than continuous. The coal moves upward during a portion of each revolution of the screw and remains stationary during the remainder of the revolution. Continuous delivery of coal to the fire box is desirable and the main object of the present invention is to provide means for effecting this result. For this purpose, I provide the conveyor screw at its forward or delivery end with a plurality of threads so positioned as to produce a continuous delivery of coal through the upwardly extending conduit."

The District Court's finding that each member of the combination described in the claim is old in the art of type B stokers except for the sole novel feature of having a plurality of threads at the delivery end of the horizontal screw, accurately describes this patent, hereafter called "double thread conveyor screw" patent.

The fourth patent is Hunt patent No. 1,724,593 and also relates to type B stokers. The specification states: "In stokers of the type where coal drops by gravity from a coal bin into a screw conveyor where it is engaged by the conveyor screw and moved forward, the conveyor screw may not operate effectively on a lump of coal that has a linear dimension greater than the pitch of the screw, because the screw can not get hold of it to move it. The main object of my invention is to improve the construction of the conveyor screw

at the points where it receives coal from the bin so that it will effectively engage unusually large, as well as smaller, lumps of coal and move the same."

The sole improvement or novelty consists of a number of notches or projections on the thread of the horizontal conveyor screw which projections are provided with sharp radial edges adopted to engage and crush large pieces of coal. The District Court's finding that this patent is an old type B stoker with notches on the horizontal conveyor screw accurately described it. This fourth patent will be referred to as the "notched conveyor screw" patent.

The defendant operates a general machine shop and foundry, and in the latter part of 1927 commenced to manufacture and sell to railroads unpatented parts to be used for maintenance and repair of locomotive stokers which had been sold to the railroads by the plaintiff. Stokers are intricate machines with many parts which in normal service wear out, deteriorate or break. Frequent repairs and replacement parts are necessary to keep stokers in serviceable condition, and it is the established and necessary practice of railroads to keep in stock for future needs substantially all of such parts. It became the practice of defendant's representative to visit the railroads and ascertain parts of stokers that defendant could make. This representative would also examine the railroad supply stores to ascertain what parts had patent markings, and no parts so marked were made by it. Defendant never constructed any stokers or assembled any parts, and the railroads used defendant's parts solely for repair purposes except possibly in a single instance and then without the defendant's knowledge.

Plaintiff also is actively engaged in this repair part business and even issues a manual purporting to teach the railroads the extent of wear on various stoker parts that can be safely tolerated before they need repair or replacement.

In 1929 the plaintiff notified the defendant that the construction of repair parts for its stokers infringed its patents, and on July 9, 1931, the plaintiff filed three suits against the defendant in the District Court for the Eastern District of Virginia. Preliminary injunctions were entered in each case by consent on July 24, 1931. The defendant discontinued its manufacture and sale of repair parts, and the three suits remained unanswered until April 23, 1937,

at which time the District Judge, in clearing up the docket, ordered that the cases be brought to a final determination. Since the defendant had recently reentered the spare parts business and wished to continue the same the cases were consolidated and tried.

The District Judge made a thorough and exhaustive study of the patents and other questions involved, and wrote an opinion in which he held as to the validity and infringement of the four patents as follows: (1) All of the plaintiff's combination claims in each of the four patents are invalid. (2) The "Duplex" patent is invalid whether it be regarded as a combination patent or as a patent for a horizontal conveyor screw with an enlarged final flight on its forward end. (3) The "distributor tube" patent is valid when limited to a tube having a lower plate with a transverse obstruction which abuts rather than deflects the lower strata of coal, but the repair tubes made by the defendant do not infringe. (4) The "double thread conveyor screw" patent is invalid whether it be regarded as a patent for a combination or a specific part. (5) The thirteen combination claims of the "notched conveyor screw patent" are invalid, but claim 14, relating to the screw itself, is valid, and was infringed by the defendant. (6) The manufacture and sale by the defendant of unpatented separate and unassembled parts for use in the repair of locomotive stokers purchased from the plaintiff did not constitute direct or contributory infringement of letters patent even though the parts were copied from parts listed and described in the plaintiff's catalogue.

Since we are in accord with the last mentioned conclusion of non-infringement, we have no occasion to consider the validity of the patents. Even if it be assumed that one or more of the combination claims in the plaintiff's patents are valid, it is not infringement for the defendant to manufacture repair parts old in the art, which are used exclusively for repair purposes and not for reconstructing the patented combination. Wilson v. Simpson, 9 How. 109, 13 L.Ed. 66; Automotive Parts Co. v. Wisconsin Axle Co., 6 Cir., 81 F.2d 125; General Motors Corp. v. Preferred Electric & Wire Corp., 2 Cir., 79 F.2d 621; Thomson-Houston Co. v. Kelsey Co., 2 Cir., 75 F. 1005; Slocomb & Co. v. Layman Mach. Co., D.C., 227 F. 94; 1 Walker, Patents, (6th Ed. 1929) Section 350. In General

Motors Corp. v. Preferred Electric & Wire Corp. supra, it was said [79 F.2d 622]:

"Appellee manufactures devices as described in the patents as original equipment on motorcars it manufactures, as well as for motorcars others manufacture. It makes the same devices for repair parts and distributes them through a subsidiary corporation. Appellant sells, to jobbers, service stations, garages, and car owners, a substantial line of repair parts for ignition apparatus. It does not make or sell complete ignition systems, nor igniters, nor timer distributors, nor relatively durable or permanent parts thereof. It sells breaker arms with or without springs, contact brackets, or repair parts in timer distributors of appellee's manufacture. These parts are susceptible to wear and destruction in operation. They are made so as to be readily detachable for replacement. It is the practice to replace rather than repair such parts."

On these facts, the appellant was held not guilty of infringement. Another case directly analogous is Automobile Parts Co. v. Wisconsin Axle Co., supra, where the defendant, who made unpatented gears and shafts for use in the repair of plaintiff's patented automobile axle, was held not to infringe.

The plaintiff does not contend that the manufacture and sale of parts to be used in the repair of a patented machine infringes a combination patent, but contends that the defendant by manufacturing virtually all the parts assists the railroads in the reconstruction of the machine. But the District Judge correctly found that there was no evidence of reconstruction or rebuilding of a stoker by a railroad (with the single exception mentioned) to such an extent as to justify the conclusion that the stoker was built anew rather than repaired, and upon this finding of fact it is clear that no infringement took place.

As we have seen, the District Judge held valid and infringed claim 14 of the "notched conveyor screw" patent, which claim covers a single member of a stoker, that is, a conveyor screw with projecting segments, but no appeal was taken from this holding. The District Judge also held valid, but not infringed, claims 1, 4 and 7 of the "distributor tube" patent, which claims describe as a separate member of the stoker the combination of a plate and abutment to govern the distribution of the fuel. We are in accord with this holding of non-infringement for, as the opinion of the District Judge shows, the device made by the defendant acts as a deflector rather than as an abutment.

The decree of the District Court is modified by omitting those parts which adjudicate the issues raised as to the validity of the claims of the patents in suit, this court expressing no opinion and making no adjudication on said issues and as so modified, the decree of the District Court is affirmed.

Modified and affirmed.