## CONNECTICUT TELEPHONE & ELECTRIC CO. v. AUTOMOTIVE EQUIPMENT CO.

District Court, D. New Jersey. October 11, 1926.)

**1. Patents ☞328.**

Wilcox & Cavanagh patent, No. 1,204,104, claims 1, 2, 4, 6, 7, 8, 9, and 11, for igniter mechanism for automobiles, *held* valid, and infringed by defendant's sale of complete assemblies for repair purposes.

**2. Patents ☞328.**

Stahl & Cavanagh patent, No. 1,221,239, claims 1 and 2, for electrical connector, consisting of plug and socket for use in igniter device, *held* not infringed.

**3. Patents ☞211(1).**

Extent of implied license to repair patented article depends on character of part out of repair and relation of substituted part to the parts with which it must coact.

**4. Patents ☞255.**

Purchaser's right to repair or restore patented article extends no further than is necessary to obtain beneficial use, and ends short of reconstruction.

**5. Patents ☞210.**

That repair of defective part of patented device is difficult or expensive is not ground for enlarging implied license.

**6. Patents ☞261.**

Patentee's sale of assembled parts as repair unit to replace like group of parts, any one of which is defective, does not authorize user to make or unauthorized dealer to sell a like assembly for like purpose.

**7. Patents ☞255.**

That patentee withdraws from market an assembly of parts previously sold as unit for repair of any one of assembled parts does not justify another in making or marketing such assemblies.

**8. Equity ☞65(2)—Plaintiff in infringement suit held not shown to be of unclean hands and not entitled to relief (Comp. St. §§ 9446, 9447; Clayton Act, § 3 [Comp. St. § 8835c]).**

Alleged violations of Rev. St. §§ 4900, 4901 (Comp. St. §§ 9446, 9447), relating to marking of patented articles, and of Clayton Act, § 3 (Comp. St. § 8835c), *held* not to bring plaintiff in patent infringement suit within maxim of unclean hands, so as not to be entitled to equitable relief.

**9. Equity ☞158.**

Defense that plaintiff comes with unclean hands, and hence is not entitled to equitable relief, need not be pleaded.

**10. Patents ☞283(1).**

Neither damages recoverable under Clayton Act, § 4 (Comp. St. § 8835d), for unfair competition, nor under Comp. St. § 9447, for improper marking of patented articles, are recoverable on counterclaim in suit in equity, in view of equity rule 30.

**11. Monopolies ☞24(1).**

One of rules governing action for unfair competition made applicable to suit for injunction under Clayton Act, § 16, is that property right of complainant must be violated.

**12. Pleading ☞8(3).**

Allegation that certain act constituted unfair competition, and that continuance thereof threatened irreparable injury to pleader, *held* mere conclusion, and insufficient pleading of damages, under Clayton Act, § 16 (Comp. St. § 8835o).

**13. Injunction ☞12—Torts ☞20.**

In action to recover damages, or to restrain continuation of wrongdoing, specific injury to suitor must be alleged and proved.

**14. Patents ☞222.**

Not every improper marking on patented article, but only those for purpose of deceiving the public, are within the denunciation of Rev. St. § 4901 (Comp. St. § 9447).

**15. Equity ☞65(1).**

Maxim denying equitable relief to one of unclean hands assumes that suitor by his own misconduct has forfeited right to all equitable relief with regard to subject-matter in litigation.

In Equity. Patent infringement suit by the Connecticut Telephone & Electric Company against the Automotive Equipment Company, wherein defendant filed counterclaim for damages for unfair competition. Counterclaim dismissed, and decree in accordance with opinion, granting part of relief sought by plaintiff.

Mitchell Bros., of New York City (Robert C. Mitchell and George H. Mitchell, both of New York City, of counsel), for complainant.

Kiddle & Margeson, of New York City (Henry T. Hornidge, of New York City, of counsel), for defendant.

RELLSTAB, District Judge. The plaintiff is a manufacturer and seller of electrical apparatus and devices for autos. It sells several forms of ignition equipment, among which is the igniter mechanism known as the Connecticut ignition system, embodied in certain patents owned by it. The defendant is a dealer in auto supplies, and sells igniter parts for use in various ignition systems, among which are certain parts made by Gilfillan Bros., designed and catalogued by it solely for use in the plaintiff's igniter, known as Connecticut model 16. In its bill the plaintiff charges the defendant with infringing three of its patents and with unfair competition in trade. The answer of the defendant asserts the invalidity of the patents and denies infringement and unfair competition. It counters by alleging unfair competition on the part of the plaintiff; that it violated Rev. Stat. § 4901 (Comp. St. § 9447), by falsely marking certain parts as patented, and the Act of October 15, 1914, commonly known as the Clayton Act (38 Stat. 730), by agreements with its customers that they shall not use or deal in the supplies furnished by the plaintiff's competitors, including the defendant. One of the patents sued upon, Cuno, No. 1,029,914, has been withdrawn from the controversy.

[1] The defendant is charged with contributory infringement of the other two patents, Wilcox & Cavanagh, No. 1,204,104, covering the igniter, and Stahl & Cavanagh, No. 1,221,239, covering an electrical connector, made up of a plug and socket used in connection with such igniter. The Connecticut model 16 igniter, made and sold under its patent, is one of a number of ignition systems of automobiles. The purpose of all these is to interrupt the primary or low-tension electric current supplied by the storage battery, and to distribute the transformed high-tension current to the spark plugs, which are inserted in the cylinders of the engine, in the proper order of firing.

The specifications of the Wilcox & Cavanagh patent state:

"This invention relates to improvements in ignition apparatus for internal combustion engines, and particularly to the means for controlling the timing of the spark and the mounting and assembling of the various parts of the timing and distributing mechanism.

"The object of this invention is to simplify and improve the construction of such parts, whereby they may be manufactured at relatively small cost without sacrifice to quality, and whereby the apparatus may be easily assembled and adjusted and disassembled, and whereby renewals may be quickly and cheaply effected.

"For example, the timer element in an apparatus of this character is one part that is subject to the greatest wear, and requires after a time readjustment or replacement. It is our plan to so construct this part of the apparatus that it can be made so cheaply, and can be so easily replaced, that an entirely new part, fully assembled, may be purchased at trifling cost and substituted in place of the old one, without requiring any special skill.

"Again, our new construction provides a novel method of mounting and adjusting; and whereas, in constructions heretofore provided, the entire timer and distributor head has been made axially adjustable for the purpose of varying the moment of the spark, in this case the entire timer head is rigidly mounted, the only moving parts being inclosed and protected. This is of advantage because it saves wear on the mechanical parts and upon the various electrical connections." [Lines 9–45, page 1 of patent.)

"The only place where wear occurs will be either in the timer element itself or in the bearing support therefor. In the event any portion of the timer element should be unduly worn or broken, it is merely necessary to remove the part 7, remove the screws 30–30 and the washers 29–29a whereupon, by disconnecting the lower end of the wire 22, the entire timer element may be removed and discarded and a new one substituted.

"We have found that the entire timer element, constructed as referred to, may be so economically produced and sold that the cost of making this change or substitution is so slight that it is far better to effect such substitution than to attempt to either repair or replace, or substantially readjust, any of the parts thereof. Furthermore, by the afore-

said construction, these changes may be made by any one without the exercise of special skill and without the use of special tools." (Lines 96–118, page 2 of patent.)

From this quotation, it is obvious that a quick and easy disassembling and substitution of a new timer and distributor assembly, in place of an old or used one, was the desideratum of the patented improvement, and in particular the substitution of a new timer assembly, though only a part thereof needed repair, replacement, or readjustment, was contemplated.

The claims allowed (12 in number) are all combination claims; the different elements all being old in the pertinent or analogous art. All except claims 3, 5, 10, and 12 are alleged to be infringed by the defendant, and all, with the exception of 7, were amended to overcome Davidson, No. 1,015,788, January 30, 1912, and Smith, No. 1,080,788, December 9, 1913. Claims 1 and 2 are subcombination claims; the other claims are for the igniter as a whole, including both interrupter and distributor parts. The timer mechanism is an element in all the claims in suit, and claims 1, 2, 6, 7, 8, and 9 refer to it as removeable. The plaintiff contends that the easy removability of the timer unit and the substitution of another, without dismembering the igniter or disturbing the adjustment of the other operative parts, is a substantial advance in the art. The distributor mechanism is an element in claims 4, 6, 7, 8, 9, and 11.

Of the claims in issue, it is deemed sufficient to set out only two—claim 1, to show the subcombination, and claim 4, to show the whole combination. In setting forth these claims, the amendments made to overcome Davidson are bracketed, while those to overcome Smith are italicized. Thus noted, they read:

"1. In an igniter apparatus of the character described, a *stationary* timer housing, a [unitary] timer element mounted therein *and thereon* [and bodily removable therefrom] and comprising a carrier movable relatively to said housing, a contact arm mounted on said carrier and having a contact point, a second stationary cooperating contact point mounted on said carrier and rotatable means for intermittently operating said arm to separate said contact points with means [mounted independently of said timer element] for moving said carrier to vary the moment of operation of said cam on said arm."

"4. In an igniter mechanism, a relatively stationary distributor part, including at least two terminals, a rotatable distributor arm, including a contact adapted to intermittently close the circuit between said terminals and including a rotatable shaft, a timer housing surrounding said shaft, and a timer element inclosed in said housing *and mounted thereon*, said timer element being rotatable *adjustably relatively to said housing*, said housing being relatively stationary, with means [mounted independently of said timer element and] outside said housing for rotatably shifting said timer element, said timer element including two make and break contacts, one of which at least is insulated from said timer element and said housing."

The stressed feature of the patent is the removable timer assembly or unit mounted in and on a stationary timer housing. This unit comprises a base plate, or carrier, mounted for partial rotation, upon which is pivoted a breaker arm carrying a contact point at its free end to intermittently make and break contact with another contact point upon an arm or bracket fixed to such base plate, and a fiber anti-friction roller pivoted to the breaker arm to contact with the rotating cam attached close to the top of the driving shaft. The distributor assembly comprises a distributing cap—being the upper section of the housing—with sockets and distributing terminals fixed therein, a radial distributing arm within this housing, carrying an electric clement and spring, removably fixed upon the upper end of the shaft, and resting upon the cam referred to. The alleged contributory infringement of this patent is directed to plaintiff's model 16 igniter, found in many different makes of automobiles.

The defendant, in support of its defense of invalidity, introduced a number of patents and publications and instances of prior public use. All these have been examined, and the contention of defendant in regard thereto carefully considered, and found not to establish such defense. An element common to all the claims in suit, though somewhat differently expressed, is the means to shift the timer element, which is declared to be mounted independently of the latter element, and (in all but claim 11) a stationary housing for the timer mechanism also is an element.

The following references only are deemed necessary for specific consideration, for it is manifest that, if these are not anticipatory, none of the others can be: Eisemann magneto, No. 953,990, April 5, 1910, described in the Motor Magazine of December 17, 1907, and in the Automotor Journal of November 14, 1908; Hall E. I. C. magneto, Automotor Journal, November 13, 1909, pp. 1358–1360,

and November 27, 1909, pp. 1433, 1434; and Remy igniter—public use.

As to Eisemann: This patent's one claim is broader than any of the Wilcox & Cavanagh claims. The specifications, as well as the publications which describe this magneto, show that it is for a different combination. The Automotor Journal for November 14, 1908, p. 1469, pointedly states that the contact-breaking mechanism (timer) is mounted on the rocking plate (adjusting arm), and the physical exhibit of this magneto bears out this statement. Therefore the timer mechanism and adjusting arm of this magneto are not independently mounted. Furthermore, Eisemann does not have a single housing for both timer and distributor mechanism (an element found in claims 6, 7, 8, 9 and 11), and a part of his housing would have to be taken off before the make and break contacts could be reached. Eisemann and Wilcox & Cavanagh's combinations are different.

As to Hall E. I. C.: This also is a magneto, and the Autocar publication of October 23, 1909, p. 649, and the Automotor Journal of November 27, 1909, p. 1433, show that the contact-breaking mechanism is mounted upon the cover plate of the stationary casing which, incloses it, and removable with it. This timer mechanism, therefore, is not mounted in or on any stationary housing and bodily removable therefrom. The Hall reference is even more remote than the Eisemann. These differences take this apparatus out of the class of the Wilcox & Cavanagh combination.

As to Remy: This is an igniter. Its adjusting arm is mounted on the breaker plate, a radical difference from the Wilcox & Cavanagh igniter, where this element is mounted independently of the breaker plate. The combinations of these two igniters are very different.

The evidence as to these alleged anticipations shows other and important differences. It also shows that they possess a number of elements found in the claims of Wilcox & Cavanagh patent; but as the question of equivalents is not involved in the defense of noninfringement, and as the stated differences of these references clearly exclude them as anticipations, no further consideration of them is deemed necessary.

As to the remaining prior art citations: These, as well as those just considered, show that, while the Wilcox & Cavanagh device entered a somewhat narrow field, there was ample room for just such a combination. Its utility is not questioned. Indeed, the de-fendant's determined purpose to manufacture and sell certain of the elements of such combination, so grouped as to readily admit of their being used in substitution for corresponding assemblies found in the plaintiff's igniter, is persuasive evidence of its commercial usefulness. The presumption of invention that goes with the grant of the patent has not been overcome. On the contrary, the record tends to strengthen it.

This patent is sustained.

[2] As to the Stahl & Cavanagh patent: This is for an improved electrical connector. The specifications state the object of the invention is "to provide a very simple and effective means for that purpose, which device may be easily applied to the end of a wire whereby the latter may be easily connected to and disconnected from an electrical terminal" (page 1, lines 9–15). The bill charges the defendant with infringing all three claims of the patent. However, the third claim was withdrawn from this litigation before final argument.

The first claim reads:

"An electrical connector, comprising a tubular socket member, a plug member arranged to slide freely into the bore of the socket member, a collapsible spring ring carried by and surrounding the plug member, and arranged to frictionally engage the wall of the bore of the socket member to frictionally hold said parts in operative position, said plug having an annular groove, said spring ring being mounted at all times therein, a portion only of said ring projecting above the surface of said plug member."

The second claim is the same, with the addition of the following: "And a sleeve-like extension at the rear end of the plug."

It is noted that neither of these claims covers either the plug or socket separately. Both are combination claims. The drawings of the patent show that the connector is applied to a distributor case, and the plaintiff so applies it to the distributor mechanism of model 16, hereinabove considered. The plaintiff imbeds the socket in the bosses made a part of the distributor cap of such model. The cap sold by the defendant has imbedded therein sockets, the counterpart of those found in the plaintiff's cap.

The defendant also sells as separate parts plugs to fit into such sockets, which outwardly are the same as plaintiff's. Connection by plug and socket is old in the art. A prior patentee—Desant—in his application for patent stated: "I am aware that plug and socket connectors have heretofore been devised, and I do not claim such a construction broadly."

Patent No. 465,430, dated December 15, 1891, page 1, lines 89–91. This patent was one of those made of record on the first rejection of the claims in the Stahl & Cavanagh patent. Plaintiff's patent, Wilcox & Lawton, No. 1,113,850, dated October 13, 1914, shows such a connector.

The socket in question is the well-known cylinder or tubular type, usable evidently with several types of plug. The claims in suit embody several limitations, to which the patentee had to submit before they were allowed. While none of the cited anticipations show precisely the structure here patented, the teachings of several, particularly Pringle, No. 574,265, dated December 29, 1896, not cited by the Patent Office, show that, if the Stahl & Cavanagh patent possesses patentable novelty, it is confined to very narrow limits. Judge Carpenter, in the Brown & Caine Case (D. C.) 10 F.(2d) 823, hereinafter more particularly referred to, pronounced it valid without disclosing his reasons.

At the argument, I had serious doubts that this connector possessed anything inventively new. Further consideration has not removed this dubiety. However, as I have reached the conclusion that on the record before me the defendant is not shown to have infringed this patent, I find it unnecessary to pass upon its validity.

As to infringement: The defendant is not charged with selling the entire igniter, or the base plate assembly in its entirety. The alleged infringement consists of the sale of the breaker arm carrying a contact point and fiber roller, accompanied with a stud, bushing, and cotter pin to be used in pivoting the breaker arm on the base plate, and a distributor cap having sockets and distributor terminals fixed therein, a radial distributing arm carrying an electric element and spring, and plugs to fit in such sockets.

As noted, the parts so sold by the defendant, viz. the breaker arm assembly and the distributor assembly, are made solely for use in the plaintiff's igniters, and are sold for substitution for like assemblies in the plaintiff's igniters, though only one of the parts of such assemblies is defective. The defendant does not sell to the car owner, but sells to garages, ignition repairmen, and dealers in automobile accessories and supplies. It asserts the right to sell these assembled parts as repair parts, to enable the owner of the igniter to preserve its fitness for use. As the igniter, when sold by the plaintiff, is freed from its patent monopoly, the sole question

is whether the sale of such assemblies comes under the head of permissible repairs.

In National Malleable Casting Co. v. American Steel Foundries (C. C. N. J.) 182 F. 626, the court said on pages 639, 640:

"The question of the right to repair, and what constitutes repair to, a patented article, as distinguished from reconstruction, has been frequently dealt with by the courts, and, generally stated, the rule to be deduced from the cases is·that, upon an absolute sale of a patented device, the purchaser has the right to the full enjoyment thereof, and an implied license to make repairs, so long as the identity of the original machine is preserved, and that such right of repair is not confined to the mere restoring of the part which is defective, but extends to replacing such part, unless it is itself made the subject of a patent."

The cases cited in support of such pronouncement are: Wilson v. Simpson, 50 U. S. (9 How.) 109, 13 L. Ed. 66; Mitchell v. Hawley, 83 U. S. (16 Wall.) 544, 21 L. Ed. 322; Cotton Tie Co. v. Simmons, 106 U. S. 89, 1 S. Ct. 52, 27 L. Ed. 79; Singer Mfg. Co. v. Springfield Foundry Co. (C. C.) 34 F. 393; Shickle v. St. Louis Car Coupler Co., 77 F. 739, 23 C. C. A. 433; Goodyear Shoe, etc., v. Jackson, 112 F. 146, 50 C. C. A. 159, 55 L. R. A. 692; Morrin v. Robert White Eng. Co. (C. C.) 138 F. 68; Gottfried v. Conrad Seipp Brew. Co. (C. C.) 8 F. 322; Aiken v. Manchester Print Works, Fed. Cas. No. 113; Leeds & Catlin Co. v. Victor Talking Mach. Co., 154 F. 58, 83 C. C. A. 170, 23 L. R. A. (N. S.) 1027, affirmed 213 U. S. 325, 29 S. Ct. 503, 53 L. Ed. 816. Cases subsequently decided are to the same effect. Among them are the following: Morgan Gardner Elec. Co. v. Buettner & Shelburne Mach. Co. (C. C. A. 7) 203 F. 490, 121 C. C. A. 612; F. F. Slocomb & Co., Inc., v. A. C. Layman Mach. Co. (D. C.) 227 F. 94, affirmed 230 F. 1021, 144 C. C. A. 286; Foglesong Mach. Co. v. J. D. Randall Co. (C. C. A. 6), 239 F. 893, 153 C. C. A. 21; Wilson v. Union Tool Co. (C. C. A. 9), 265 F. 669, affirmed 259 U. S. 107, 42 S. Ct. 427, 66 L. Ed. 848; Hess-Bright Mfg. Co. v. Bearings Co. (D. C.) 271 F. 350; Duplicator Mfg. Co. v. Heyer (C. C. A.) 284 F. 242, reversed 263 U. S. 100, 44 S. Ct. 31, 68 L. Ed. 189, again considered in another suit between the same parties, 6 F.(2d) 578 (C. C. A.).

[3] In the application of the rule to particular facts, the results apparently are not always harmonious. As an illustration, compare Wagner Typewriter Co. v. Webster Co. (C. C.) 144 F. 405, with Heyer Duplicator

Co., Inc., v. Ditto, Inc. (C. C. A. 7), 6 F. (2d) 578. In reconditioning a device, it is not always necessary that the defective part itself be repaired, or even exactly replaced. What may be done under the implied license to repair depends upon the character of the part out of repair, and the relation of the substituted part to the parts with which it is to coact.

In the ordinary use of the timer element or assembly, usually the first and more frequent replacement is of the contact points. Because of this fact, the plaintiff contends that in such circumstances the utmost the user can do under his right of repair is to replace the defective points, that no one but itself can furnish any part not in need of repair, and that if the user goes beyond this and replaces other parts of the timer assembly, he becomes a contributory infringer. On the other hand, the defendant contends that the user's right to repair is not confined to merely repairing or replacing the defective point, but that, in view of the patent's disclosure of the purpose and object of the improvement, the impracticability of removing the point and replacing it with another, and the settled practice by manufacturers of igniters, when such point becomes defective, to substitute a unit of which the point is but a part, the user's right extends to replacing such particular assembly.

In the beginning, but only for a short period, the practice in this particular art, including that of the plaintiff, was to knock out the old and put in a new point in its place. This did not always prove satisfactory, as the securing of a proper alignment of these points—essential to secure the proper sparking—required more than the average mechanical skill. Such skill not being always at the user's command, the plaintiff, and those furnishing supply parts for other igniters, adopted the practice of furnishing a new breaker arm, with roller and point attached, to be substituted for a like assembly in igniters, though only a new point was needed. At such time the plaintiff used the cotter pin mounting disclosed in the patent. Later the plaintiff alone adopted the plan of replacing the entire base plate and mountings, though only the contact points needed replacing. In this assembly it discarded the cotter pin and riveted over the head of the pivot stud. In all other ignition systems, the manufacturers continue the practice of supplying the lesser assembly as a unit of repair. This substitution of the larger assembly and the use of the rivet, instead of the cotter pin, the plaintiff claims, was done that the user might obtain the best service, inasmuch as the adjustment or alignment of the contact points is a delicate matter, and could be done better at its factory. On the other hand, the defendant contends that this larger assembly was made by the plaintiff to secure to it a monopoly in repair work to which it is not entitled, and that the use of the rivet in place of the cotter pin in fastening the pivot stud was to further such monopoly, by making it difficult to merely replace the breaker arm; it now being necessary to file off the head of the rivet.

Concededly, both parties supply a more comprehensive assembly of parts for installation than is likely to be required at the time the repair or restoration becomes necessary. Whatever the reason for substituting a new assembly—large or small—when but the contact point needed replacing, the evidence establishes that that practice is by far the quickest and most practicable way to put the timer element in working order, and the more nearly certain method to insure the proper transmission of the spark. Barring accidents, the arm, made of metal, is good for the life of the igniter, but undisputably, through use, some of the other parts of the timer element at some time would be in need of repair. Concededly all these parts could be legitimately replaced by the user as they became defective.

The defendant contends that, as the patentees in their specifications of invention, in distinguishing their igniter from those of the prior art, stated that the timer element was "subject to the greatest wear, and requires after a time readjustment or replacement" (page 1, lines 25, 26, of patent), and that they so arranged their timer element that it could be easily and cheaply replaced "without the exercise of special skill and without the use of special tools" (page 2, lines 116–118), the plaintiff is estopped from preventing the user of the igniter from enjoying the very distinctive feature of this invention, and that, as the breaker arm assembly is but a part of the timer element, the furnishing of such lesser unit is fully justified.

True, this advantage constitutes an advance in the art, but it does not follow, because the igniters of the patent have gone into general use, that manufacturers of, or dealers in, ignition parts have the right to make and sell these timer elements, regardless of the wishes of the patentee. Assuming that a maker or dealer in parts of a patented device, engaged in competition with the patentee, in furnishing such parts have all the rights of a user of such device, what rights

has the user obtained, under the disclosures made in this patent, over those obtained by the user of any other patented device? None whatever. The user's right to repair or restore does not arise from the patent, but from his purchase.

[4] It is based on his equitable right to the full use of the device that has passed into his ownership, extends no further than is necessary to obtain such beneficial use, and ends short of reconstruction. The disclosure of the advantages in the patent—quick, easy, and cheap renewals of the timer element—is not a dedication to the public, but an assertion of a substantial advance in the art. It may be the essence of the invention, or but one of several new features; but, whatever it is, the monopoly therein, within the limits of the claims, goes to the patentee. On the sale of the patented igniter the purchaser obtains the judicially sanctioned right to repair and replace defective parts, in order they he may continue in the enjoyment of his purchase, but without the consent of the patentee his rights extend no further.

The defendant further contends that the taking out of the old point and the putting in of a new one, while mechanically possible, is not practicable, and is not reasonably demandable, that skilled mechanics are not always available when a point gives out, and that, if they were, the preparation for such a limited replacement, the skill required, and the expense entailed in making it would be out of all proportion to the result to be obtained. Treated as a practical matter, there is much force in this contention. However, such consideration will have to give way, if the right to furnish the parts that do not need repair vests in the patentee.

[5-7] The right of the supplier of parts of a patented device, other than the patentee or his authorized agent for such purpose, cannot exceed that of the lawful user of the device. That it is difficult or expensive to repair a defective part is not a ground for enlarging the implied license, viz. the right to maintain the patented article in the service intended in its purchase. That the owner of the patent, who has the right to make and sell any part of the patented device, finds it to his pecuniary advantage to assemble parts of his combination and sell them as repair units, in substitution or replacement of a like group of parts, in case any one of such parts becomes defective, does not authorize the user to make, or the dealer not authorized by the patentee to sell, a like assembly for a like purpose. Neither does the fact that the owner of the patent subsequently withdraws such an assembly from the market justify the user or other person in making or marketing such an assembly. Nor can justification be found for such a course of trading, because makers of other igniters, having similar functions, market like assemblies for like purposes.

Because the plaintiff in the first instance issued the assembly with the fewer parts, it is not estopped from withdrawing such a unit or from issuing the larger assembly. Both the issuing of these units and the withdrawing of one of them was in right of its patent, and not a surrender of such right. The placing of these assemblies—large or small—on the market by the owner of the patent enables users and dealers to purchase them from such owner for use in the patented igniter. But neither user nor dealer would have the right to make or deal in these assemblies simply because the owner of the patent was doing so, or had done so, except in the one instance, where all of the parts of such assembly were in need of immediate repair. To hold otherwise would deprive the owner of the patent of a substantial right secured by it.

There is no contention that each of the elements that make up the breaker arm unit are likely to need repair at one time, and the evidence shows the contrary. The ordinary periods of life of these several parts are various. It would be unusual or extraordinary if all should require repairs at the time the defendant's unit is sold or used for replacement; but, if they did, then a replacement of the whole unit would be justified.

Now, what if but one of the members of such unit becomes defective? To my mind, after considering the authorities, no more than the defective part can be repaired or replaced under the user's implied license. To go beyond this is to impinge upon the rights of the patentee. An igniter is a highly technical piece of mechanism, and requires a perfect functioning of its several parts. The injury that may be sustained by the owner of the patent is not necessarily limited to the loss of profits by being deprived of the sale of such substituted parts. A greater damage would be the loss of prestige and business reputation by the imperfect operation of the timer element, soon to be reflected in less sales of his complete igniter. This situation would be very likely to occur if the timer could be furnished by competitors, whose interest in such igniter does not extend beyond the making and selling of such parts.

To say that others are as competent to make the substituted parts and adjust them

to the remaining parts is not a sufficient answer. They may or may not be. If not, the suggested injury is very likely to happen. If they are, while the likelihood of injury to the plaintiff has not been increased through the substitution of these parts, it is a sufficient answer to say that under the protection of the patent the owner thereof is not required to accept the hazard of any injury resulting from the substitution of parts of the patented device, other than those due to its own manufacture. The cases mainly relied upon by the defendant as justifying a different conclusion than here reached are: Wagner Typewriter Co. v. F. S. Webster Co. (C. C.) 144 F. 405, Foglesong Mach. Co. v. J. D. Randall Co., 239 F. 893, 153 C. C. A. 21, and Hess-Bright Mfg. Co. v. Bearings Co. (D. C.) 271 F. 350.

In the Wagner Typewriter Case it was held that the substitution of a new spool with new ribbon wound thereon was justified as a repair, though the old spool was still serviceable and only the old ribbon was worn out. This tends to support the defendant's contention. However, it is directly opposed by the latter case of Heyer Duplicator Co., Inc., v. Ditto, Inc. (C. C. A. 7) 6 F. (2d) 578. The patent there was for an improvement in multiple copying machines. One element of the claims alleged to have been infringed was a specially designed spool which fitted into the machine. On this spool was attached a gelatinous band, upon which was transferred the print to be multiplied. This band was soon used up and frequent replacement was necessary. The defendant furnished new bands, wound on like spools, to replace similar elements, though the band only was worn out.

The defendant was first charged with infringement in furnishing both spools and band. The District Court dismissed the bill. The appellate court (284 F. 242) unanimously held that furnishing the spools was an infringement. They divided as to the band, the majority holding that infringement also extended to the bands. The Supreme Court (263 U. S. 100, 44 S. Ct. 31, 68 L. Ed. 189) reversed, holding that the bands were freed from the monopoly. With regard to the spools it said:

"Inasmuch as, after the present bill had been dismissed, it was reinstated on condition that the plaintiff be limited for recovery of profits or damages to the period after the reinstatement, and as the evidence is that the only spools used since that date came from the plaintiff, we think it unnecessary to make any order touching the spools."

Subsequently another case between the same parties reached the Circuit Court of Appeals. 6 F. (2d) 578. The charge of infringement was now limited to the spools on which the gelatinous bands were wound. After referring to the Supreme Court's decision, and particularly to that part of the opinion just quoted, the Circuit Court of Appeals said:

"Examining that opinion, we find nothing that calls for a change in the conclusion heretofore reached. * * * In the present appeal we are to determine whether the element in the combination which the alleged infringer supplied is possessed of lasting and permanent qualities, or is an element which, in the very operation of the machine, must be replaced frequently. We answer the question, as we did before, in appellee's favor, and say the spool or roll is not perishable or temporary in character, but is a permanent part of the machine, and is especially designed and constructed to fit into patentee's combination."

The interpretation there given to the Supreme Court's differentiation between spool and band, to me, seems the only one permissible.

In Foglesong Mach. Co. v. J. D. Randall Co., 239 F. 893, 153 C. C. A. 21, heavier chains were substituted for chains which had become weakened through use. These in turn required two new sprockets and two new sprocket wheels. All these substitutions were held to be repair and not reconstruction. The original chains having become unserviceable, the replacement of new and serviceable chains was justified. That the new chain was heavier would not per se show reconstruction. However, the substitution of new sprockets and sprocket wheels, simply because the heavier chains required them, in my judgment, was reconstruction, and not repair.

In Hess-Bright Mfg. Co. v. Bearings Co. (D. C.) 271 F. 350, the patented bearings had become worn; the user reground them, whereupon new and larger balls became necessary. This was held to be a repair, and not a reconstruction, though the old balls themselves had not become useless.

These last two cases are readily distinguishable from the instant case. Here it is not contended, and the record does not show, that a substitution of a defective tungsten point would in itself require a new breaker arm, or even any one of the other members of the breaker arm unit, or any other part of the timer element to coact therewith. On the facts of the last three cases considered,

that of Heyer Duplicator Co., Inc., v. Ditto, Inc., is the more like the instant case, and supports the reasoning herein.

Since the final argument of this case and the preparation of the foregoing opinion relating to the question of repairs, the suit of the present plaintiff against Brown & Caine, Inc., has been decided (D. C.) 10 F. (2d) 823. That case involved the same patents and claims sued upon and considered in the instant case. Other claims of these patents and two other patents were also involved in the Illinois suit. It was held that these were valid and the claims infringed.

Among the parts there held to be infringements, as appears by the final decree, there were a number similar to those found to be infringed in this case, though manufactured by other persons. There, as here, the defendant asserted the right to substitute the entire breaker plate assembly as repairs, though it also made and sold the lesser unit —breaker arm assembly—and some of the separate parts used in such assemblies. Judge Carpenter, who wrote the opinion in that case, discussed solely the question of repairs. As his reasoning is so apt, I quote several parts:

"The main contention here is upon the breaker arm assembly, as a removable unit, and whether a sale of such a unit constitutes legitimate repair for a damaged or worn-out part of the igniter, or is replacement." Page 824.

There, as here, the contentions were made that the plaintiff riveted the breaker arm, etc., to make it difficult to remove the defective part and to substitute another arm; that the claims did not cover the individual element, or the breaker assembly; and that it was estopped because the patent disclosed the easy and ready method of reconditioning the patented device by removing and replacing the breaker plate assembly, when any one of its elements became defective.

With reference to the estoppel, Judge Carpenter said: "I cannot agree with the defendant that by the use of the language quoted the plaintiff intended to and did *invite* the public to make its invention, or to license the public without any consideration to make this breaker assembly unit. Where a patentee has made an admitted advance and contribution to the art, language such as is here relied upon by the defendant should be so construed as to vitalize, and not paralyze, the invention." Page 826.

Again: "The plaintiff should not be penalized for making a construction wherein a *major* substitution is *desirable*, though a *less-er* substitution is sufficient. A patentee undoubtedly has the right to make his device as he sees fit. A user has the undoubted right to replace a worn-out element with a new element, and in effecting such a repair the user may do it in any way he chooses, with this restriction: He must not replace other elements of the patented device that are not worn out. * * * The evidence here shows that the repair of worn-out points can be made." Page 827.

The evidence shows that the substitution of a new point in the place of a defective one is not only mechanically possible, but practical when performed by a skilled mechanic. Such a substitution was accomplished by plaintiff's counsel in open court at the argument. The evidence also shows that Gilfillan Bros., from whom the defendant obtained the breaker arm and other parts to be used in substitution of like parts of the plaintiff's timer element, makes, advertises, and sells tungsten points to take the place of the plaintiff's points. True, not many of such points have been sold for such purpose; but this is readily understandable, in view of the large sales of the complained-of Gilfillan breaker arm assembly, which has such a point affixed thereto. The physical replacement of a point on the breaker arm of the plaintiff's assembly being not only mechanically possible but reasonably practical, the user's right to restore or replace a point when defective is confined to such replacement and neither he nor the dealer anticipating his need of such a replacement will be permitted to substitute an entire breaker arm assembly in such a case.

As to the distributor mechanism: This comprises a cap, with metal socket and distributing terminals imbedded therein, and an arm, carrying a metal segment and spring riveted thereto. Both cap and arm are made of insulating material, such as bakelite, which is brittle and subject to breakage, likely to take place through the carelessness of automobile operators. The cap also becomes useless when, through leakage of electricity, its insulating qualities are destroyed. The terminals, the segment, and the spring become defective in the course of use; the former two parts through burning by the electric current, and the latter by breakage and excessive bending. Of these parts in ordinary use, the segment is the most likely to require replacement. The socket imbedded in the cap is a part of an electrical terminal, to which a wire is connected. This electrical connector—socket and plug—is covered by the combination claims, 1 and 2, of the Stahl &

Cavanagh patent, No. 1,221,239, hereinbefore considered.

The defendant sells caps and arms complete, which are the same as those made and sold by the plaintiff. The right of the defendant to replace a broken arm or cap, or to replace the latter when it has lost its insulating qualities, is conceded. However, the defendant furnishes caps complete in substitution for those found in plaintiff's igniter, though only the terminal points of the caps are defective, and the arm complete, though only its spring or segment is defective. This the plaintiff contends constitutes contributory infringement.

The evidence indicates that the removal of the terminal points of the cap and the spring and segment of the arm, and the substitution of new parts in place thereof, is mechanically possible. Much of what the defendant says in support of its right to furnish the distributor assembly or parts thereof has already been passed upon. In addition, it insists that, in view of the brittle character of the material of which the arm and cap is made, and the method employed in fixing those parts on or into those elements, it is not reasonably practical to remove the defective part and substitute a new one. Undoubtedly, it would require more care, and perhaps skill to make such replacement, than in the case of the substitution of members on the metal breaker arm. The risk of breaking the distributor arm or cap in attempting that kind of restoration would also be much greater. But the fact that more care or skill would be required is not sufficient to justify the discarding of a perfect, good distributor arm or cap, and substituting new ones in place thereof. As regards the probable breakage of the distributor arm or cap in the attempt to remove the defective parts attached thereto, and to replace them with new parts, it is sufficient to say that, if breakage results in such endeavor, a new arm or cap complete may be substituted.

With regard to the socket embodied in the distributor cap, and the plug to co-operate therewith, and which, as already stated, are parts of the combination claims of the Stahl & Cavanagh patent: Concededly, if the socket becomes defective, the defendant may replace it as a repair part. However, as noted, the defendant sells its socket as a part of its distributor cap complete, and this, the plaintiff insists, is an infringement. But it is not necessarily so. If the condition of the constituents of the cap, not including the socket, is such that a repair is needed, the defendant may supply the cap, complete, now including a socket, regardless of the condition of the socket in the old cap. This, because the socket as a separate element is not covered by any claims. Indeed, it could not be, as it is quite old.

But, if the condition of the cap does not authorize its complete replacement as a repair, the fact that the socket was defective would not justify the replacement of the cap. The socket occupies the same relation to the distributor cap as the tungsten point bears to the breaker arm assembly, neither of which is separately covered by a claim. The defective point may be replaced with a new one without infringement, and the need of such replacement does not justify the substitution of a new breaker arm. That may be done only if the condition of the arm, irrespective of the condition of the point, requires replacement. So it is if only the socket were in need of replacement.

As to the plug: This also is not separately covered by any of the claims in suit. If it becomes defective, for the same reason as heretofore stated in regard to the socket and tungsten point, it may be replaced as a repair part. But it is said, as the plug and distributor cap complete are both sold by defendant, the socket and plug may be brought into co-operation, which would violate the plaintiff's monopoly. This, of course, is possible; but mere possibility is not sufficient to constitute infringement. In the ordinary course of commercial dealings, this is not probable. If the old plug is defective, it may be legally replaced. If it continues serviceable, it is usable with the new socket, and in the absence of proof to the contrary the presumption is that such use will continue, and that new plugs will be sold only to replace defective ones. There is nothing in the present record that negatives such presumption.

The result is that the defendant infringes claims 1, 2, 4, 6, 7, 8, 9, and 11 of the Wilcox & Cavanagh patent by the sale of the breaker arm complete, and claims 4, 6, 7, 8, 9, and 11 of the same patent by the sale of the distributor mechanism complete, and that it does not infringe claims 1 and 2 of the Stahl & Cavanagh patent.

[8, 9] Counsel for the defendant further contends that the plaintiff comes into court with unclean hands, and hence its bill should be dismissed. This contention has but scant supporting allegations in the answer. Its only reference to plaintiff's alleged misconduct is found in paragraph 14, where, after denying plaintiff's pleaded purpose in marketing its breaker plate assembly, it counters with the charge that the plaintiff's real pur-

pose was to stifle competition in the manufacture and sale of the wearing parts of such assembly, and to unlawfully secure a monopoly in the traffic therein, by compelling users of plaintiff's igniter to purchase the whole assembly, though only parts thereof required replacement. However, the maxim here invoked need not be pleaded. If the evidence discloses such unconscionable conduct as to justify the application of this maxim, the court, if necessary, will upon its own motion apply it and deny relief. Bentley v. Tibbals (C. C. A. 2) 223 F. 247, 252, 138 C. C. A. 489.

In the counterclaim, which charges the plaintiff with unfair competition, other acts of alleged misconduct on the plaintiff's part are pleaded, and as the evidence introduced in support thereof, as well as that submitted to establish the part of the answer just referred to, bears on the charge of unclean hands, this evidence will be considered under that head. The particulars of the counterclaim are as follows:

That the plaintiff falsely claimed and advertised that the parts of the igniter which deteriorate through wear and breakage, and require replacement in order to preserve its fitness, were covered by letters patent; that it falsely marked such parts "Patented," for the purpose of deceiving the public; that it falsely represented that the repair parts for igniters sold by its competitors, including the defendant, were inferior and infringements of plaintiff's patents; that it unlawfully seeks to prevent users from purchasing such repair parts from defendant and other competitors, by the practice of selling or contracting to sell its igniter parts "on the condition, agreement, or understanding that the purchaser thereof shall not use or deal in the goods, * * * supplies, * * * or other commodities * * * of plaintiff's competitors, * * * including this defendant, for the purpose and with the effect of substantially lessening competition, and of creating a monopoly in favor of plaintiff in said line of commerce, and of diverting from defendant and depriving defendant of the benefits of trade and commerce to which it was accustomed and entitled, and in violation of the Act of October 15, 1914, c. 323, known as the Clayton Act, * * * and in violation of section 4901 of the United States Revised Statutes"; that the complained-of acts constitute unfair competition; and that the plaintiff threatens to continue the same; all to the irreparable damage of defendant.

In addition to praying that the bill be dismissed, the defendant prays for an injunction to enjoin plaintiff and its agents, etc., from continuing these unlawful practices; for an accounting of the damages sustained by defendant by reason of the alleged unlawful practices; for judgment for threefold amount of the damages ascertained; and for one-half of the penalties prescribed by R. S. § 4901, for the false markings.

[10] The right to threefold damages is given by section 4 of the Clayton Act (Comp. St. § 8835d). These damages as well as the penalties prescribed by R. S. § 4901, cannot be recovered on a counterclaim interposed in a suit in equity (equity rule 30), but only in an action at law. Motion Picture Patents Co. v. Eclair Film Co. (D. C.) 208 F. 416; Folberth Auto Specialty Co. v. Mayo Skinner Mfg. Co. (D. C.) 292 F. 883, 897; General Electric Co. v. Minneapolis Elec. Lamp Co. (D. C.) 10 F. (2d) 851, 855, 856.

[11] As to injunctive relief: This is expressly provided for by section 16 of the Clayton Act (Comp. St. § 8835o), to prevent "threatened loss or damages" by a violation of the anti-trust laws, and is limited to such cases where a like relief "is granted by courts of equity under the rules governing such proceedings." One of such rules is that an action for unfair competition lies only where a property right of the complainant has been invaded. Armstrong Cork Co. v. Ringwalt Linoleum Works (D. C.) 235 F. 458, and cases cited at page 460. This case was reversed on a question of practice, without reviewing or questioning the soundness of the law declared and followed by the District Court. See 240 F. 1022, 153 C. C. A. 665. "The question here is not so much the rights of either party as against the public but their rights as between themselves. See Morrison v. Moat, 9 Hare, 241, 258." International News Service v. Associated Press, 248 U. S. 215, 236, 39 S. Ct. 68, 71 (63 L. Ed. 211, 2 A. L. R. 293).

[12, 13] The counterclaim does not allege that the defendant suffered any specific or individual damages by reason of the recited acts. The only reference to injury is that these acts constitute unfair competition and that a continuation thereof is threatened by the plaintiff to defendant's irreparable damage. This is but a characterization and a conclusion, and insufficient as a pleading. Buckeye Powder Co. v. E. I. Du Pont Co. (D. C.) 196 F. 514, and cases cited at page 517. But, worse than that, because not curable by amendment, the evidence is no more specific. It does not show that the defendant sustained damages different from those which the gen-

eral public suffers as a result of the supposed wrongdoing. To maintain an action to recover damages, or to restrain a continuation of wrongdoing, specific injury resulting to the suitor must be alleged and proven. Motion Picture Patents Co. v. Eclair Film Co., supra, 208 F. 416; Paine Lumber Co. v. Neal, 244 U. S. 459, 471, 37 S. Ct. 718, 61 L. Ed. 1256; Keough v. Chicago & N. W. Ry. Co., 260 U. S. 156, 165, 43 S. Ct. 47, 67 L. Ed. 183.

If the practices here charged as violating the anti-trust acts are inimical "to the interest of the public," the defendant may bring them to the attention of the Federal Trade Commission, which, for the purpose of protecting the general public, is authorized to investigate alleged "unfair methods of competition in commerce" and make appropriate orders that the offender "cease and desist from using such methods of competition." Act Sept. 26, 1914, c. 311, § 5 (Comp. St. § 8836e); Standard Oil Co. v. Federal Trade Commission (C. C. A. 3) 282 F. 81. Furthermore, the defendant having been found to infringe the plaintiff's patent, the court cannot grant it protective relief in marketing of the infringing spare parts. Hedman Mfg. Co. v. Todd Protectograph Co. (C. C. A. 7) 265 F. 273, 278.

The counterclaim is dismissed.

Harking back to the charge of unclean hands: First, as to plaintiff's alleged wrongful purpose in marketing its breaker plate assembly (paragraph 14, defendant's answer): As noted, defendant charges that plaintiff's real purpose was to stifle competition and unlawfully secure a monopoly in supplying this unit. When dealing with the charge of infringement, it was held that the plaintiff was within its rights to supply the breaker plate assembly for replacement, though only parts thereof were defective. This being so, its conduct in that respect cannot be held oppressive.

Second, as to the alleged false advertising and marking: The Wilcox & Cavanagh and Stahl & Cavanagh patents (the markings of which are some of these challenged) are not all of the patents owned by plaintiff relating to ignition systems, and model 16 is one of a number of the igniters marketed by it. The igniter known by this number at times differed in some of its features. Its breaker plate carries the markings of four patents owned by the plaintiff, one of which is that of Wilcox & Cavanagh. The distributor cap has molded into it markings of the plaintiff's two patents, one of which is the Stahl & Cavanagh patent. The distributor arm, at the time the answer in this case was filed, had molded into the marking of one of plaintiff's patents, the features of which were no longer a part of this arm. This last-mentioned marking was removed shortly thereafter, and the plaintiff concedes that, as the distributor arm was then made, such marking was improper.

The testimony, uncontradicted and not argumentatively assailed, shows that originally this marking was proper, but that subsequently, when the feature of that patent was eliminated from the arm, the marking inadvertently was continued thereon. The markings on the breaker plate indicate patents covering features of the igniter model 16, of which the plate is a part. However, as neither the breaker plate assembly nor any of its elements is separately covered by the Wilcox & Cavanagh patent, the defendant contends that the marking relating to such patent had no proper place on the plate, and that these markings were so placed solely to deceive the public into the belief that the breaker plate assembly, which the plaintiff makes and sells as a repair unit, was covered by patents.

Under R. S. § 4900 (Comp. St. § 9446), it was the duty of plaintiff to affix on the igniter the word "Patented," together with the dates of the patents the features of which were embodied therein. As the Wilcox & Cavanagh patent is for the whole igniter, none of the claims covering only a single element, it follows that a choice of place for marking was open to the owner of the patent. The plaintiff chose to notice that patent with the other markings, and selected the breaker plate as the place for it. The fact that the plaintiff sells the breaker plate assembly as a unit of repair does not itself prove that the marking on such plate was mala fides. Some part of the remainder of the igniter in the course of use would require repair or replacement. If these parts, rather than the plate, had been selected for the patent markings, the charge of bad faith would equally apply to such selection, and, in my opinion, such charge would be as equally ineffective. Therefore something more than that the markings were put on an element being part of a so-called "unit of repair" is required to show deception. That they were put on an element that was inside the igniter, and therefore not as readily seen as if placed on the outside of the housing, is more significant. So, also, plaintiff's advertisement in its trade catalogue, where, in relation to this breaker arm assembly, appears the following: "Note: The Connecticut breaker assembly is

fully protected by patents and infringement is liable to prosecution."

The significance of this last-mentioned claim is not lessened, but rather strengthened, by the additional fact that no such notice appears in the catalogue in relation to the complete igniter. Facts of this character suggest that, whatever was the original purpose of these markings on the breaker plate, at some time thereafter the notices evidenced by them and the one appearing in the catalogue were intended, not so much for the general public as for the user of the igniters, and those who might be called upon to replace a defective element of the breaker plate assembly. Only the person who looked at the timer element would see the patent markings, and only those who had an interest in replacing parts of that or similar assemblies would be apt to see the warning notice in plaintiff's catalogue. Seemingly, then, to these, and not to the public generally, such notices were directed.

[14] Assuming that these marks were improperly placed, it is not every marking of that kind that falls within the denunciation of R. S. § 4901. The inhibition extends only to those that are "for the purpose of deceiving the public." While the selection of the plate as the place for such marking and the giving of the warning notice in the catalogue, suggests that the plaintiff intended to convey to users and the trade that it, and it only, had the right to replace the plate assembly, it does not establish that it did this in the full consciousness that it had no such exclusive right. On the contrary, the evidence indicates that it believed that its patents gave it such right.

Third, as to the charge that plaintiff falsely represented that the repair parts for igniters sold by defendant and other competitors were inferior: The record does not support this accusation, or show that the plaintiff's conduct in this respect was unwarranted or unfair.

Fourth, as to the alleged violation of the Clayton Act: The charge as framed here brings it within the denunciation of section 3 of the act (Comp. St. § 8835c). The plaintiff, in anticipation of the need of spare or replacement parts for its igniters, including the breaker and distributor assemblies in question, furnishes such parts to jobbers and service stations under written agreements. The defendant insists that these agreements violate the Clayton Act, while the plaintiff contends that they are agency and not sales contracts.

In the form used for distributors, the plaintiff agrees to give them the right to sell its ignition system units for distribution to the trade, and to extend to them a preferential discount of 50 per cent. from its published list prices upon the "receipt of an initial order for its units and parts." This agreement also states that the plaintiff does not wish to sell direct to the service *stations*, and that the discount to the latter would be 35 per cent. from list.

The distributor, on his part, "agrees not to sell or attempt to sell for use on the Connecticut System any but genuine units or parts made by the company," and "to act, as regards policy, under the direction of the company during the life of this contract." In the form used for service station agreements the plaintiff agrees "to sell ignition units and parts at a discount of 35 per cent.," and the dealer agrees "to carry a minimum service stock of Connecticut parts amounting to $——— net; to use and sell (for use with Connecticut ignition systems) only genuine parts and units manufactured by the Connecticut Telephone & Electric Company;" and "to act in accordance with the policies of the Connecticut Telephone & Electric Company in the matter of servicing Connecticut equipped cars and the sale of parts and units." The clause, "for use with Connecticut ignition systems," in the first paragraph of the service station agreements, was not a part of the earlier contracts, but was inserted before the filing of the bill in this suit.

The plaintiff does not reserve title to the supplies until sold, or undertake to take back those unsold, as in the case of Federal Trade Commission v. Curtis Publishing Co., 260 U. S. 568, 43 S. Ct. 210, 67 L. Ed. 408. While the contractees are agents of the plaintiff for certain purposes, they buy and sell on their own account. To my mind, these agreements carry more of the earmarks of sales contracts than those so held to be in Standard Fashion Co. v. Magrane-Houston Co., 258 U. S. 346, 42 S. Ct. 360, 66 L. Ed. 653.

These contracts undoubtedly put the contractees under certain restraints, but the Clayton Act does not bar all restraints of trade. Its inhibition is of leases, sales, and contracts for sale of goods, and the fixing of prices, discounts, or rebates upon "condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller," where the effect "may be to substantially less-

en competition or tend to create a monopoly in any line of commerce." Section 3.

A comparison of this statutory prohibition with the quoted provisions of the contracts in question shows that neither the distributors nor the persons carrying on the service stations are barred from dealing in the spare parts for other igniters, a number of which are made and sold in competition with those made by the plaintiff. The restraint operates solely upon supplying parts for the plaintiff's igniters. As to these igniters, the contractees are confined to the supplies furnished by the plaintiff. Under the head of infringement in dealing with the alleged right of a competitor to supply spare parts not needed to replace a defective part of the plaintiff's igniter, it is held that there are good reasons why none but the owner of the patent should be permitted to supply the other parts. The reasons there given seemingly furnish an ethical commercial basis for the restraint imposed in these contracts, so far as they relate to parts not strictly repair parts.

However, as the contracts are not limited to such other parts, but include repair parts as well, the question appears to be reduced to this: Is the restraint, so far as it relates to the purchase of parts intended to be used only in making repairs, such a lessening of competition as to be "substantial," within the meaning of this particular legislation? Assuming that it is, does such wrongful restraint come within the maxim of "unclean hands," so as to prevent the plaintiff from maintaining this infringement suit?

[15] This maxim assumes that the suitor has by his own misconduct forfeited his right to all equitable relief with regard to the subject-matter which he has put into litigation. 1 Pomeroy's Equity Jurisprudence (3d Ed.) § 397. "It is a principle in chancery that he who asks relief must have acted in good faith. The equitable powers of this court can never be exerted in behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage. To aid a party in such a case would make this court the abettor of iniquity." Bein v. Heath, 47 U. S. (6 How.) 228, 246, 247 (12 L. Ed. 416). But "that principle does not repel all sinners from the precincts of courts of equity, nor does it disqualify any plaintiff from obtaining full relief there who has not done iniquity in the very transaction concerning which he complains. The wrong which may be invoked to defeat him must have an immediate and necessary relation to the equity for the enforcement of

which he prays." Talbot v. Independent Order of Owls (C. C. A. 8) 220 F. 660, 662, 136 C. C. A. 268, 270, and cases cited. See, also, Bentley v. Tibbals (C. C. A. 2), 223 F. 247; Woodward v. Woodward, 41 N. J. Eq. 224, 4 A. 424; Vulcan Detinning Co. v. American Can Co. (N. J. Err. & App.) 72 N. J. Eq. 387, 67 A. 339, 12 L. R. A. (N. S.) 102; Weidmann Silk Dyeing Co. v. East Jersey Water Co., 88 N. J. Eq. 397, 102 A. 858, 1056; Prindiville v. Johnson & Higgins (N. J. Err. & App.) 93 N. J. Eq. 425, 116 A. 785; Neubeck v. Neubeck (N. J. Err. & App.) 94 N. J. Eq. 167, 119 A. 26, 27 A. L. R. 172.

The soundness of this equitable principle cannot be doubted, but in its application it is not every inequitable act in the subject-matter of the suit that bars the suitor from equitable relief, if otherwise entitled thereto. Board of Trade v. Christie Grain & Stock Co., 198 U. S. 236, 25 S. Ct. 637, 49 L. Ed. 1031; International News Service v. Associated Press, 248 U. S. 215, 39 S. Ct. 68, 63 L. Ed. 211, 2 A. L. R. 293; General Electric Co. v. Minneapolis Elec. Lamp Co., 10 F.(2d) 851.

In the News Service Case the "unclean hands" maxim was sought to be invoked against the plaintiff, because it admittedly practiced some of the things that it attributed to the defendant, viz. taking the news of a rival agency as a "tip" and selling it, if verified by independent investigation. It was held that such practices in the circumstance of that case were "not shown to be such as to constitute an unconscientious or inequitable attitude towards its adversary, so as to fix upon complainant the taint of unclean hands, and debar it on this ground from the relief to which it is otherwise entitled." That a weighing of reciprocal unfair practices and discriminating between them is justified, in determining whether the suitor is entitled to invoke the power of a court of conscience in his behalf, is emphasized by the fact that the strong dissent filed in that case makes no reference to these practices on the part of the plaintiff, or the views expressed in regard thereto in the majority opinion.

In the instant case the plaintiff encountered a determined purpose on the part of competitors to share with it in supplying these spare parts. Its right to select distributors and service stations, and to supply them under contracts with the spare parts, is not, and cannot be, successfully questioned. If in this competitive struggle for the market, to which the plaintiff believed it was entitled under its patents, it may have gone be-

yond its legal rights in constraining its contractees to buy from it all the spare parts for its igniters, such action, assuming it to be illegal, is not such unconscionable or inequitable conduct as to debar it from maintaining its suit against one who infringes its patents.

A decree may be entered, adjudging that the Wilcox & Cavanagh patent is valid, and that the defendant infringed its claims as herein recited; that the defendant has not infringed the Stahl & Cavanagh patent; and that the defendant's counterclaim be dismissed. The plaintiff's charge of unfair competition will be dealt with in a separate opinion.