## ELECTRIC AUTO–LITE CO. v. P. & D. MFG. CO., Inc., et al.
### No. 5436.

District Court, E. D. New York.

May 7, 1934.

Braselton, Whitcomb & Davies, of Toledo, Ohio, and Ward, Crosby & Neal, of New York City (Edmund B. Whitcomb, of Toledo, Ohio, Joshua Ward, of New York City, Carl F. Schaffer, of Toledo, Ohio, and Jesse A. Holton, of New York City, of counsel), for plaintiff.

Kenyon & Kenyon, of New York City (Schechter, Lotsch & Sulzberger, Theodore S. Kenyon, John L. Lotsch, and W. Houston Kenyon, Jr., all of New York City, of counsel), for defendants.

INCH, District Judge.

This is a suit in equity. Plaintiff, an Ohio corporation, with its principal place of business at Toledo, Ohio, sues the defendants, one being a New York corporation, with its principal place of business in the city of New York, the others are the president, and treasurer, respectively, of the corporation, and are citizens and residents of the state of New York.

Prior to 1930, these individual defendants were copartners. Thereafter they incorporated this copartnership in the name of the corporate defendant. Where the word "defendant" is used, I refer to the corporate defendant.

The bill of complaint sets forth three causes of action, unfair competition, contributory, and in two instances direct, infringement of letters patent belonging to plaintiff, and alleged violation of plaintiff's registered trade-marks.

As to the cause of action for unfair competition, the amount involved clearly exceeds the statutory requirement.

The relief asked for in the bill is the usual injunction against infringement, accounting, etc., and that defendants be enjoined from unfair competition in the manufacture and sale of "parts" used by plaintiff in its manufacture and sale of its patented combinations, in which combinations these "parts" are elements.

The issues raised by the amended answer of defendants were duly tried, and the questions of law were duly argued upon most comprehensive and excellent briefs, previously submitted, by the eminent counsel for the respective parties.

The issues of fact present little difficulty. There is substantially no dispute as to them.

The real dispute is as to the respective rights of these two corporations, plaintiff and defendant, in the large and important field of manufacture and sale of "parts" for electrical devices used extensively in the modern automobile, in which industry it plainly appears the corporate defendant is a competitor of plaintiff. Whether this competition is lawful or not is the real question.

The charge of patent infringement involves alleged contributory infringement of ten patents which will be hereafter referred to, and of direct infringement of the Wollenweber patent, United States No. 1,669,-888, and the Gilchrist patent, United States No. 1,735,112.

The proof shows that plaintiff, at large expense, and after much research, manufactures what it terms an "Auto-Lite System" for automobiles. This system is composed of a number of units, in substance, a starter, generator, distributor, coil, and starter switch. Each of these mechanical devices or units is manufactured by plaintiff and is covered by one or more of the ten United States patents

already referred to. Most of them are combination patents and have as elements certain small parts such as screws, contact points, breaker arms, rotors (a little fan-shaped affair which slides over the contact points in the distributor and also acts as a fan), distributor caps, condensers, etc.

In other words, there are these innumerable small "parts" in this "system" of units, some of which "parts" are expected to wear out long before the particular unit loses its usefulness, because they bear the heavy burden of the modern electric power plant of the present automobile. Also some "parts" prove defective or are broken before the expected usefulness of the particular unit is ended.

Nevertheless, dealing with the character of this "system," it is plain that a failure of a "part" to properly function may, because of the sensitive character of the "system," seriously impede or prevent the proper functioning of other units in the "system."

There appear to be other electrical "systems" than those of plaintiff, but the Auto-Lite "system" is being used in a large number of automobiles manufactured by different automobile makers.

Plaintiff therefore keeps on hand a large supply of small "parts" which it distributes to its various service stations throughout the United States and to others that may require them.

This service department has approximately 40 central stations, 1300 service stations, and 3,000 parts depots, in this country.

The defendant operates a plant in the Eastern District of New York, and employs eighteen salesmen throughout the United States. It does not attempt to sell its "parts" to an automobile manufacturer, but devotes its energy to supplying the "parts" to service stations, mechanics, and owners of the automobiles, by and through some 1800 jobbers, with possibly 25,000 outlets in the United States.

There is no proof here, nor is the claim made, that defendant manufactures and sells a particular patented unit aside from the direct infringement already referred to. On the contrary, it is the right to manufacture and sell these small "parts" that defendant is contending for and which plaintiff contests.

Since 1922 plaintiff has been prominent in the automobile industry. In 1925 its net worth was close to $5,000,000. In 1928 this increased to nearly $16,000,000. In 1931 a still further increase took place to approximately $21,000,000.

Naturally there has been, during the period of depression, a falling off in value, but during the four years prior to 1932, the original equipment business of plaintiff amounted to over $60,000,000, and a substantial part of the business of plaintiff has been in the supplying of these small "parts" for its units. Between 1929 and 1932 the volume of this "parts" business amounted to over $5,000,000.

Then again plaintiff has expended large sums of money in the development and sales promotion of its product. It expended over $1,000,000 for patents and royalties. It has spent over $1,000,000 for sale promotion, engineering, experimenting, and developing.

Its "parts" business has two branches, one is where a guaranty is given and, if a part is defective, it is replaced without charge. The cost of this branch amounts to considerable, and it also requires furnishing free "parts" to car owners in maintaining a guaranty to car manufacturers.

There is what is termed in this department slow and fast moving "parts" based on the demand for same. All of this requires plaintiff to manufacture and maintain large stocks of these "parts."

Seventy-five per cent. of plaintiff's sales relate to these "fast moving" parts. These number approximately 700, or about 14 per cent. of the combined number of "parts" involved.

The money return is in these fast-moving parts, and it is as to these "parts" that plaintiff meets with competition from defendant.

I can find no sufficient evidence that defendants ever deliberately and expressly made "parts" and sold them as plaintiff's "parts." In other words, the proof is insufficient that defendants expressly deceived a customer into believing that the "parts" purchased by such car owner was one manufactured and sold by plaintiff.

To be sure, there were one or two witnesses produced by plaintiff, men operating little automobile repair shops, who did testify that they did cheat the public in this manner, but the great weight of testimony is to the contrary so far as these defendants are concerned. Such isolated cases of dishonesty cannot, in fairness to the defendants, be attributed to them. We can eliminate, therefore, the usual case of an express effort to deceive the public, an unfair competition which needs no citation of authorities to condemn.

The intention, however, of a competitor to unfairly compete may be ascertained in other ways than by such express statements by it, and the opportunity to unfairly compete may arise and be shown from and by the manner in which an otherwise lawful business is conducted.

It appears, therefore, that both plaintiff and defendant are conducting a substantial business in these small "parts" that are used in plaintiff's units.

Defendant sells its "parts" under its own name and in most instances under its own trade-mark.

Plaintiff claims that defendant cannot lawfully manufacture and sell any of these parts both because to do so is unfair competition as well as being an infringement of the patent monopoly owned by plaintiff.

The defendant, on the other hand, insists that the market is open to it as long as it does not expressly deceive the public into thinking that it is buying plaintiff's "parts," and that, if plaintiff is successful in this suit, it will simply mean that the court has given plaintiff "a monopoly unlimited as to time, in the business of supplying the unpatented and unpatentable wearing parts of ignition devices," and will "force every car owner, whose car is equipped with plaintiff's ignition devices, to come to plaintiff and pay its price whenever those ignition devices are in need of common repair." This fear on the part of defendant is not without warrant. It is a part of the common experience in an industry, and has been mentioned by the courts. Cortelyou v. Charles E. Johnson & Co. (C. C. A.) 145 F. 933, page 934; Wagner, etc., Co. v. F. S. Webster Co. (C. C.) 144 F. 405; Pyle-National Co. v. Oliver, etc., Co. (C. C. A.) 281 F. 632.

■ An important object of the law of unfair competition is the protection of the public, the individual consumer.

The desire to increase prices to this consumer is aided or retarded by the ability to make the consumer pay the increased price, and a monopoly as to a product for which there is and must be a demand is persuasive towards getting more for the product than otherwise it would be possible or than the product is reasonably worth with a reasonable profit. "The primary purpose of our patent laws is not the creation of private fortunes." Motion Pictures, etc., Co. v. Universal, etc., Co., 243 U. S. 502, 37 S. Ct. 416, 418, 61 L. Ed. 871, L. R. A. 1917E, 1187, Ann. Cas. 1918A, 959.

It is here that a patent monopoly exists, for a limited time, as a reward for progress in the art and for the benefit to the public because of the advance in the art.

Unless, however, such patent monopoly clearly belongs to plaintiff, the danger to the public here urged by the defendant cannot be ignored, unless competition, which is a means of preventing the taking of unfair advantage of the public, is fair and honest competition, by competitors who truly stand on their own reputation and are proud of their product.

■ I agree with counsel for the defendants that there is no contributory infringement where the "part" supplied by the defendant does not respond to an element recited in a claim of plaintiff's patent or where the part does not serve to "distinguish the invention," marking the advance upon the prior art, or where the facts as to the plaintiff's conduct as to its business fairly imply an understanding or bargain between the plaintiff and the consumer that the quick-detachable, and relatively short lived part, shall be replaced whenever same is worn or burned out, broken, or defective. Wilson v. Simpson, 9 How. (50 U. S.) 109, 13 L. Ed. 66; Mitchell v. Hawley, 16 Wall. (83 U. S.) 544, 21 L. Ed. 322; Motion Picture Patents Co. v. Universal Film Co., 243 U. S. 502, 37 S. Ct. 416, 61 L. Ed. 871, L. R. A. 1917E, 1187, Ann. Cas. 1918A, 959; United States v. General Electric Co., 272 U. S. 476, 47 S. Ct. 192, 71 L. Ed. 362; Heyer, etc. v. Duplicator, etc., 263 U. S. 100, 44 S. Ct. 31, 68 L. Ed. 189; Thomson-Houston, etc., Co. v. Kelsey, etc., Co. (C. C. A.) 75 F. 1005; Wagner Typewriter Co. v. F. S. Webster Co. (C. C.) 144 F. 405; Gillette Safety Razor Co. v. Standard, etc., Corporation (C. C. A.) 64 F.(2d) 6; Leeds & Catlin Co. v. Victor Talking, etc., Co. (C. C. A.) 154 F. 58, 23 L. R. A. (N. S.) 1027; Goodyear Shoe, etc., Co. v. Jackson (C. C. A.) 112 F. 146, 55 L. R. A. 692; Shickle, etc., Co. v. St. Louis, etc., Co. (C. C. A.) 77 F. 739; Slocomb & Co. v. A. C. Layman, etc., Co. (C. C. A.) 227 F. 94, affirmed (C. C. A.) 230 F. 1021; Foglesong, etc., Co. v. J. D. Randall Co. (C. C. A.) 239 F. 893; Pyle, etc., Co. v. Oliver, etc., Co. (C. C. A.) 281 F. 632; Eclipse Machine, etc., Co. v. J. H. Specialty, etc., Co. (D. C.) 4 F. Supp. 306; Sirdar Rubber Co. Ltd. v. Wallington Co., [1905] 1 Chan. 451 (England); Fetherstonaugh & Fox, The Law and Practise of Letters Patent of Invention in Canada (Toronto 1926) p. 118.

Thus as far back as 1850 the Supreme Court stated the general law still applicable

to this situation where in Wilson v. Simpson et al., 9 How. (50 U. S.) 109, at page 125, 13 L. Ed. 66, in discussing the right of the owner of a patented combination machine to replace new knives, the court says: "The proof in the case is, that one of Woodworth's machines, properly made, will last in use for several years, but that its cutting-knives will wear out and must be replaced at least every sixty or ninety days. * * * The right of the assignee to replace the cutter-knives is not because they are of perishable materials, but because the inventor of the machine has so arranged them as a part of its combination, that the machine could not be continued in use without a succession of knives at short intervals. Unless they were replaced, the invention would have been but of little use to the inventor or to others. The other constituent parts of this invention, though liable to be worn out, are not made with reference to any use of them which will require them to be replaced. These without having a definite duration, are contemplated by the inventor to last so long as the materials of which they are formed can hold together in use in such a combination. No replacement of them at intermediate intervals is meant or is necessary. They may be repaired as the use may require."

Thus the difference is indicated between the right to repair and replace, as well as forbidding a "reconstruction."

Motion Picture Patents Co. v. Universal Film Co., 243 U. S. 502, 37 S. Ct. 416, 61 L. Ed. 871, L. R. A. 1917E, 1187, Ann. Cas. 1918A, 959. The grant by patent is limited to the invention described in the claims, and does not empower the patent owner to extend the scope of the patent monopoly by restricting their use to materials necessary for their operation but forming no part of the patented invention.

Heyer v. Duplicator Mfg. Co., 263 U. S. 100, 44 S. Ct. 31, 32, 68 L. Ed. 189. The court in speaking of the patented machine says: "The machine is costly, the bands are a cheap and common article of commerce. * * * It is assumed for the purposes of argument that the claim (a combination patent) is valid and covers the band when used in this combination, since otherwise there would be nothing to discuss."

Gillette Safety Razor Co. v. Standard Safety Razor Corporation, 64 F.(2d) 6 (C. C. A. 2). The court held that unpatented components of a patented invention which wear out relatively quicker may be replaced without infringement.

Pyle-National Co. v. Oliver, etc., Co., 281 F. 632 (C. C. A. 8). Here the court held that no one under the guise of merely furnishing needed repair parts to a patented machine "may in fact make or remake the patented device or machine in competition with or in violation of the rights of" the patentee, yet it again asserts the rule in regard to the right to make necessary repairs, and states: "The more accessible and convenient such repair parts are to be had the more valuable and useful the machine." Page 633 of 281 F.

Wilson v. Union Tool Co. (C. C. A.) 265 F. 669. "The principle that a right of the user of a patented device extends to repairs of the device does not go to the extent of replacing parts, such as obtaining duplicates or spare parts and extras in anticipation of breakage or destruction. National M. Casting Co. v. American Steel Foundries (C. C.) 182 F. 626; Slocomb & Co. v. Layman Co. (D. C.) 227 F. 94." Page 672 of 265 F.

Connecticut Telephone, etc., Co. v. Automotive, etc., Co. (D. C.) 14 F.(2d) 957, 963. Here the defendant was charged with the sale of the breaker arm and a distributor cap, etc., not with selling an entire igniter, and the defendant did not sell to car owners but to garages, repairmen, accessory stores. The decision goes carefully over all the authorities, and distinguishes between "reconstruction," which is unlawful, and lawful repair. The court held: "No more than the defective part can be repaired or replaced under the user's implied license. To go beyond this is to impinge upon the rights of the patentee."

In Eclipse Machine Co. v. J. H. Specialty Mfg. Co., 4 F. Supp. 306, 316 (D. C. E. D. N. Y.), Judge Campbell states this same general rule, but points out that this implied right of a user did not exist in that case, for the reason that "the defendant does not sell springs only to replace broken springs or to meet an emergency; on the contrary, the object of the defendant is to sell as many springs as it can by the wholesale through distributors all over the country. * * * The defendant * * * does not even repair a defective part but supplies new parts to any purchaser."

Judge Campbell therefore held that the defendant "does not stand in the place of a user, it is a competitor of the plaintiff, and its whole attitude is that of a trespasser. Morrin v. Robert White, etc. [(C. C.) 138 F. 68], supra, affirmed (C. C. A.) 143 F. 519."

However, in that case the court found as a fact that the "spring" was not a fragile or breakable part intended to be consumed in

use; that it was "separately patented" and was the main, dominant, and distinctive element of the drive.

Davis Electrical Works v. Edison, etc., Co., 60 F. 276 (C. C. A. 1). Whether the result is repair or reconstruction depends more on common sense based on the evidence than on determination of rules of law.

There is no necessity to unduly extend this opinion by further citation of authority, as the law applicable is well established in regard to this form of contributory infringement. I am not so sure, however, that every case of a supplier of parts must be decided by this law.

For instance, in Shickle, etc., Co. v. St. Louis, etc., Co., 77 F. 739, 743 (C. C. A. 8): "The knuckle is not claimed separately, and is not in itself a patented article. It follows, we think, that * * * a person who purchases one of the patent car couplers thereby acquires the right to replace a knuckle which happens to be broken, provided the drawheads still remain serviceable. To that end, we think that a purchaser may either manufacture a knuckle, or *procure some one else to manufacture it for his use.*"

The court, however, did state that they did not decide that one could manufacture knuckles and sell them *indiscriminately* to "all persons who see fit to buy them." (Italics mine.)

And again in Goodyear Shoe Machinery Co. v. Jackson et al., 112 F. 146, 55 L. R. A. 692 (C. C. A. 1): "The essence of contributory infringement of a patent lies in concerting or planning with others in an unlawful invasion of the patentee's rights, which is usually done by making or selling a part of the patented invention with the intent and purpose of aiding another in its sale or use."

"The purchased machine has become the individual property of the purchaser. * * * He may sell it, or he may use it so long as its usefulness lasts. * * * He may prolong its life and usefulness by repairs more or less extensive, so long as its original identity is not lost. * * * He cannot, under the pretext of repairs, build another machine"— citing cases. Page 149 of 112 F. "Where the patent is for a machine, which commonly embraces the combination of many constituent elements, the question of infringement by the purchaser will turn upon whether the machine is only partially worn out or partially destroyed, or is entirely worn out, and so beyond repair in a practical sense." Page 151 of 112 F. The question in that case was of

the right to replace a broken or worn-out "cam" by a new one. The court said: "If the patented invention had been for this particular form of cam, or had been simply for an improved feed, and the whole invention had resided substantially in the cam, the case would have presented a different aspect. *. : * It may be this cam was the characteristic and most essential element in the combination. The breaking or wearing out of this cam resulted in only a partial destruction of the patented combination, and its replacement by a new cam was plainly a restoration, and not a substantial reconstruction of the combination." It is evident that here the word "partial" reconstruction is used in the sense of "replacement" of a part.

In brief, the situation in the case before me may be stated in the following extracts: Under certain circumstances, "there was, consequently, no implied license to use the spare parts in these machines. As such use, unless licensed, clearly constituted an infringement, the sale of the spare parts to be so used violated the injunction." Union Tool Co. v. Wilson, 259 U. S. 107–114, 42 S. Ct. 427, 430, 66 L. Ed. 848.

Under other circumstances, the purchaser of the patented combination machine "has the right to use that machine until it has lived its normal life. * * * He has the right to mend it, if need be, to continue that service. * : * To go beyond such mending is reconstruction and an infringement." Bassick, etc., Co. v. Ready, etc., Co. (D. C.) 22 F.(2d) 331, 340.

The extent to which this "mending" may go is a question of common sense based on the evidence.

An effort to unduly broaden this right to "mend" by the allowed "replacement" of a part under certain emergency is well illustrated in Connecticut, etc., Co. v. Brown, etc., (D. C.) 10 F.(2d) 823. This was held to be a rebuilding of plaintiff's patented structure under the guise of repairing a worn-out part. The court held that the defendant had no right to make an entire substitution of parts. Plaintiff advertised that any one could remove the breaker assembly unit, remove the damaged contact points, a broken spring, substitute new ones, and replace the repair assembly unit, but plaintiff had fastened the several parts in such a way as to make the substitution of a new or damaged part difficult and expensive. The result was that the defendant made and sold a complete part assembly as a unit as well as separate elements, and as a result the complete unit was in-

stalled in the igniter rather than the old one repaired. The court held that plaintiff's method of manufacture did not prevent the user from making repairs and did not compel him to purchase a new unit. Moreover, the defendant advertised replacement parts, but these were patented parts belonging to plaintiff.

■ Where, therefore, a user of a patented device can repair or replace a part, he is not guilty of infringement if he does so, and it seems to me that he should have the right to obtain the necessary unpatented and unpatentable parts when his own right arises. If this is so, I fail to see how he can exercise this right if he is compelled to get the part only from the owner of the patent.

There is therefore a legitimate business in the making of unpatented or unpatentable parts to meet this emergency.

This results in competition between the owner of the patents and the makers of such parts. This competition is covered by two laws regulating it. One is the law of infringement, which we have just discussed. The other is the law of unfair competition, which plaintiff here likewise invokes.

■ Apparently, where the competitor is shown by the facts, not to be manufacturing and selling an unpatented part for the specific purpose of the proper use by the user of such part, but, on the contrary, seeks to "induce the making of improper replacement," an injunction may issue to prevent, not the actual infringement, but the plainly "threatened" infringement.

On the other hand, the courts have intervened and enjoined a business of a competitor on the ground that a manufacturer is entitled to the reputation it has made in an industry, and the consumer should be allowed to distinguish between the products of the two, particularly as to the "source."

■ "The essence of the wrong consists in the sale of the goods of one manufacturer or vendor for those of another." Elgin, etc., Co. v. Illinois, etc., Co., 179 U. S. 665, 21 S. Ct. 270, 274, 45 L. Ed. 365.

However, such subterfuge is not confined to express palming off of merchandise. A court of equity can consider the facts of a particular case and extend this equitable relief where it, within reason, is required. International News Service v. Associated Press, 248 U. S. 215, 39 S. Ct. 68, 63 L. Ed. 211, 2 A. L. R. 293. This part of the law is "plastic." Ely-Norris, etc., Co. v. Mosler Safe Co. (C. C. A.) 7 F.(2d) 603.

In the latter case, the Supreme Court, in reversing the lower court (273 U. S. 132, 47 S. Ct. 314, 71 L. Ed. 578), indicated that it had not been proven that the public, had it known the facts, would have gone to plaintiff, rather than to the other competitor.

Plaintiff cites Estes & Sons v. George Frost Co. (C. C. A.) 176 F. 338; Thayer Telkee Corp. v. Davenport-Tayler Mfg. Co. (D. C.) 46 F.(2d) 559; Enterprise Mfg. Co. v. Landers, etc. (C. C. A.) 131 F. 240; Yale, etc., Co. v. Alder (C. C. A.) 154 F. 37; Barton et al. v. Rex-Oil Co. (C. C. A.) 2 F.(2d) 402, 40 A. L. R. 424; Rice & Hutchins v. Vera Shoe Co. (C. C. A.) 290 F. 124; Knabe Bros. Co. v. American Piano Co. (C. C. A.) 229 F. 23. These cases indicate that "deception" is unfair competition. Without "deception," therefore, a plaintiff's case falls, yet what may be "deception" in a particular case is not so limited, but reasonably may be inferred from subtle plans and course of business duly proved.

Accordingly, we find the defendant urging as follows:

"Car owners do not buy particular ignition repair parts by name or trade-mark. They buy the skill of a repairman, trusting to the accuracy of his diagnosis, the skill of his hands, and his judgment in determining which parts need to be replaced and what to replace them with. Ignition repair parts are not sold like toothpaste or pianos, the public making a conscious selection between competing brand names. Ignition repair parts are merely the tools of the trained workman, like the alloy, gutta percha or cement which the dentist employs as his judgment may dictate.

"When trouble develops in his ignition system, the car owner goes to the repairman he trusts, whether it be an Auto-Lite authorized service station or an independent reliable garageman, and employs this repairman to restore the car to good running order." (Defendant's Brief, p. 49.)

And from this argument it is argued that there could not possibly be "deception" by defendant in this case, citing such cases as Marvel Co. v. Pearl et al. (C. C. A.) 133 F. 160; A. C. Gilbert Co. v. Shemitz (C. C. A.) 45 F.(2d) 98; Rathbone, Sard & Co. v. Champion, etc., Co. (C. C. A.) 189 F. 26, 37 L. R. A. (N. S.) 258; Wagner Typewriter Co. v. F. S. Webster Co. (C. C.) 144 F. 405; Magee Furnace v. Le Barron, 127 Mass. 115; American Safety Razor Corp. v. International Safety Razor Corp. (D. C.) 26 F.(2d) 108.

While there is here testimony that the public, that is, the car owner, is generally

careless or even ignorant of the mechanism in plaintiff's system, or some other system, yet this very fact and the testimony on which this argument of defendant is based seems to show two things; one is, that the car owner can be and is readily imposed upon because of this condition, and, second, that the repairman and skilled mechanic is certainly able to repair or replace from parts in his possession without the necessity for any specific guide to plaintiff's unit by defendant.

▮ The use by a competitor of the name of another competitor must be clearly "bona fide." Nims, The Law of Unfair Competition and Trade Marks (3d Ed.), p. 390.

Defendant claims that using plaintiff's numbers for its parts, although adding its own numbers, as well as the phrase "to fit Auto-Lite," is simply a description, and is justified by such cases as Deering Harvester Co. v. Whitman & Barnes Mfg. Co. (C. C. A.) 91 F. 376, but it seems to me the facts in that case differ essentially from the facts before me, and that there is here no necessity or common practice requiring defendant to thus advertise plaintiff's name and numbers.

Moreover, in the Deering Harvester Co. Case, the court expressly held: "Their whole course of dealing, as shown by this evidence, has been such as to mislead no one into buying their product as that of appellants." Page 380 of 91 F.

▮ The view I take, therefore, on the evidence before me, is that the court of equity should not prevent, unless required, the legitimate business of defendant, but should eliminate from such business all effort to "deceive," or which may reasonably tend to "deceive," a car owner.

Under such circumstances, if a court of equity can remedy such situation adequately, by application of the law of unfair competition, thus avoiding the necessity to plaintiff of the usual large expense, research, and time required in a complicated patent suit, it is proper to do so.

I will refer to this briefly again, but turn now to the ten patents claimed to have been infringed, and which, as they are in this case, must be considered.

The ten patents relied on by plaintiff in regard to alleged contributory infringement are: Moses (United States) No. 1,306,116; Moses (United States) No. 1,383,229; Schwarzman (United States) No. 1,482,204; Gilchrist (United States) No. 1,676,185; Patterson (United States) No. 1,703,319. These are called igniter patents, and in addition, the following generator patents: Gilchrist (United States) No. 1,375,658; Gilchrist (United States) No. 1,443,073; Gilchrist (United States) No. 1,490,104; Gilchrist (United States) No. 1,520,237; and Ehrlich (United States) No. 1,517,281.

Moses patent (United States) No. 1,306,116, relates to new and useful improvements in ignition apparatus. The invention accordingly consists in the various features of construction, combination of elements, and arrangement of parts. (Lines 6–33–35, page 1, of patent.)

Moses patent (United States) No. 1,383,229, sets forth the same statement. (Lines 6–21–23, page 1, of patent.)

Schwarzman patent (United States) No. 1,482,204, is claimed to be a new and useful improvement in timer distributors. (Lines 9, 10, page 1, of patent.) It is plain that the novelty patented comprehends the use of many elements old in the art.

Gilchrist patent (United States) No. 1,676,185: "This invention relates to ignition systems * * * and more particularly to a timer and distributor mechanism. * * * Still another object of our invention relates to the assembly and associated operative parts of the mechanism. Further objects of our invention relate to details of construction of various parts and various part assemblies which not only cooperate in the combination," etc. (Lines 1–23–25–28–31 of patent, page 1.)

Patterson patent (United States) No. 1,703,319: "This invention relates to ignition apparatus * * * which includes means for timing and distributing the spark * * * an object of our invention is to improve the construction and operation of such apparatus and to provide for the ready accessibility of the parts," etc. (Lines 4–8–12 of patent, page 1.) So much for the igniter patents.

The mere fact that brushes are used in the generator patents does not change the fact that "brushes" were old in the art.

▮ I have examined the prior art introduced by defendant, and have considered these various patents of plaintiff with reference to the state of that art at the time these patents were granted and applied for. Traitel Marble Co. v. U. T. Hungerford, etc., Co. (C. C. A.) 18 F.(2d) 66. While the steps in advance of the art may have been slight, yet each of these patents is, in my opinion, a valid patent. It is perfectly possible for a new idea or result to be based on a combination of

old ideas and result in a valid patent. Parks v. Booth, 102 U. S. 96, 26 L. Ed. 54.

I also think that title to each of these patents has been sufficiently proven by plaintiff.

At the same time I find that the particular parts manufactured and sold by defendant, which are complained of here by plaintiff, are in themselves old in the art, not covered specifically by any patent claim, and cannot reasonably be said to distinguish the invention for which the patent was granted.

I also find that, when the plaintiff sold its "system of units" to the automobile manufacturer, it did so with the direct understanding that the latter intended to sell an automobile so equipped to a purchaser, that purchaser, therefore, when he buys an automobile, owns every part of it, which includes each of the units of plaintiff's "system," and that this implied agreement, above mentioned, entitles such purchaser to repair, or, in case of necessity, even replace any one of these small parts, in issue, in order to enjoy the continued usefulness of the unit. Such purchaser, however, cannot make an unnecessary replacement instead of a repair, nor can he reconstruct the unit in this manner, yet such purchaser is not required to go to the expense and delay of attempting to repair a contact point, for instance, where a new one is readily available and where common sense is all that is needed to indicate that such attempted repair is either impossible or silly. The owner of the patent is entitled to no such protection.

Finally, I find that there is no proof that defendant ever made or sold the complete unit or device covered by one of these patents we are now discussing, and that these particular parts in plaintiff's unit are expressly made for easy and quick detachment and replacement, and that plaintiff has constant demands for same from car owners and depends upon same for its department of "quick moving parts."

Plaintiff asserts that its aim is to build equipment that will continue to function usefully during the life of the automobile.

One witness (Shank) states that, while plaintiff feels responsible for its product as long as it has a useful life, they have endeavored to fix a minimum of five years, but the testimony of this witness also states that during this period of usefulness they expect "to repair parts" of the devices for it during such period, and that they are particularly interested in being prepared to furnish, from their service stations, "parts" that have worn out. As a matter of fact, a period of approximately eighteen months naturally represents the demand for supply "parts."

The fact must also be considered of the nature and character of not only the patented devices but the purpose for which they are being used, and the surrounding circumstances, which here include an automobile, possibly traveling distances in a large country, and in sparsely settled districts, with all the innumerable obstacles and lack of accommodation presented to a car owner by such travel.

The territory covered by plaintiff is necessarily limited, and any inference that is unreasonable with this right of a car owner to enjoy the continued use of his car is to be avoided if no patent monopoly requires it.

The unwarranted interference in an industry by courts or government leads to trouble and uncertainty, but wise regulations of business by government and adaptability by the courts of its equity power, so that justice and fair dealing may obtain in an industry in accordance with the growth, change of conditions, purpose, etc., is concerned, requires that the court be a live and flexible source of power to promote the progress of that industry and those who are consumers in it; that is, in this case the consuming public, i. e., the car owner.

Where plaintiff complains to a court of equity that defendant is unlawfully and unfairly competing with it in its business, the burden of proof rests upon the plaintiff. It may attempt to show several ways in which this business is unlawfully interfered with. If one is sufficient and the court can supply an adequate remedy without unduly interfering with or possibly destroying a legitimate business, that remedy should be the one to be applied.

Unfair competition is receiving more attention by industry to-day than ever before.

For instance, we find certain "codes" of the National Industry Recovery Act (48 Stat. 195), one apparently adopted by the "Wholesale Automotive Trade," and this code apparently becomes a part of the law of the land under section 3 (f) thereof (15 USCA § 703 (f). The citation from this code so far as applicable is: "(2) The sale by any member of the trade of any article of automotive merchandise known to the trade to be identical with and to be manufactured by the manufacturer of some branded or trade-marked article at a price lower or on terms more favorable than the prices and terms in the currently published suggested resale schedules of said manufacturer for said branded or trade-

marked article, is an unfair method of competition." (Page 192, Journal of the Patent Office Society, March 1934, Vol. XVI, No. 3, Carl Fenning, patent attorney.)

Again quoting from the same article, at page 203, we find the following: "Among the things made unfair competition by the codes are: * * * To copy or duplicate * * * parts for recognized machines and sell them at prices under the reasonable cost of the original manufacturers as approved by the Planning and Fair Practice Agency and subject to review by the Administrator. Knitting, Braiding, and Wire Covering Machine Industry."

The above references are not mentioned by either of the parties to this suit, and it is possible to argue that such agreements, whether binding or not, may be considered by some to be contrary to the present decisions of courts or they may be considered steps lawfully taken in the right direction. They are only mentioned here for the reason that apparently those dominant in a particular industry now consider such things "unfair competition." Of course, to those who would like to control an industry, any competition by the smaller concern is "unfair."

But it is not necessary to apply any such new doctrine in the case before me, for the facts seem to me to indicate that the problem here can be solved by old ideas of honest dealing.

If the right to produce, manufacture, and sell an unpatented part that is old in the art exists, this right is open to all in the industry, and should not be discouraged or interfered with, if exercised fairly, with due regard to the rights of others in the same industry. It is possible for some concerns to make these parts better than others. It may convince mechanics, or endeavor to do so, that its product is better than any other in the market. Such trade is proper, and such endeavor to perfect a product and believe in its accomplishment is one of the great incentives to progress in the industry. But no one can contend that one concern can "Chinese copy" the production of another concern and advertise it as the product of that other concern, nor should this be allowed indirectly where the intent is plain not to rely upon its own reputation but to increase its sales by means of the reputation of the other.

This defendant does just this thing. It voluntarily attaches itself to plaintiff's business by its advertising, catalogues, etc., like a barnacle to a ship, and rides with plaintiff on the theory that the owner of a car will likely "replace" a perfectly good part made by plaintiff with a part made by defendant because it is easier and quicker to do so and results in more profit to the mechanic and the defendant.

It may possibly be, therefore, the duty of the court to enjoin, not a plain case of infringement, but an inducement to infringe. "The duty of careful investigation into the objects of the purchasers," etc., is on the defendant where the facts show by its "advertisements and course of business * * * a willingness to co-operate with any infringer * * * by making and selling to him a device or element of a patented combination." Thomson-Houston, etc., Co. v. Kelsey, etc., Co. (C. C. A.) 75 F. 1005, 1010.

I prefer, however, on the particular facts here, to place my decision, and for the reasons above stated, not on the grounds of alleged contributory infringement thus possibly entirely destroying what may be a legitimate business, but on the theory of unfair competition, which may preserve that business within legitimate bounds and at the same time, in my opinion, fully protect, so far as proper, the business of plaintiff and the rights of the owner of an automobile.

This brings us to the course of business of defendant.

The defendant does not design these parts in question. It waits until plaintiff's devices are shown in an automobile show or in some other public manner. It then scrutinizes these devices to see what quick-wearing and quick-moving "parts" are indicated. It then obtains some of these "parts" and carries them to its factory, where exact duplicates thereof are attempted to be made and large quantities manufactured and distributed throughout the country in active competition with plaintiff. Moreover, it publishes extensive catalogues for the use of its customers, advertising to them, in effect, that it has so copied these "parts" of plaintiff, and that they can be "replaced" in case of need for such parts. It even indicates the "number" by which mechanics can follow the "number" of plaintiff for a "part."

In other words, it does everything it can to "supplant" plaintiff's "parts" with its "parts." This is not fair competition.

On the contrary, while there is no express fraud countenanced by defendant, it knows or should know that it has done all that it can to cling to the advertising and reputation of plaintiff short of actually substituting an alleged plaintiff's part for the original.

324

Moreover, I fail to see why defendant, the later arrival in the market, should choose a "circle" in which to put its initials, often times illegible, in place of the registered trade-mark of plaintiff, "a circle" with its initials. Certainly there is no necessity for that if defendant's contention is correct that it stands upon its own merits.

It is these subtle things that show which way the wind blows on the question of intention.

As I judge the advertising of defendant, the part of its business complained of by plaintiff is to make unpatented "Auto-Lite parts" for plaintiff's "system," well knowing that the average car owner, if informed of the substitution or proposed substitution, would probably reject the substitution or insist upon the Auto-Lite part. Thus, due to the ignorance or carelessness of the average car owner, which it is the purpose of a court to protect, so far as reasonable, defendant unfairly competes in its present method of doing business with plaintiff.

Accordingly, in my judgment, defendant can make the unpatented parts complained of just as well as the plaintiff, but it cannot advertise plaintiff's name in connection with these "parts" or plaintiff's numbers to identify them, or advertise that its "parts" fit Auto-Lite devices, or advertise that it sells parts to "replace" Auto-Lite parts. It must sell its "parts," of which I understand it is justly proud, to its customers on the express condition that a proposed "substitution" be made known to the purchaser so that he may choose when necessity requires. It must change its trade-mark to one not so similar to that of plaintiff. If defendant can make better "parts" than plaintiff, it will be rewarded legitimately by those who are in a position to appreciate such superiority when a car owner must lawfully repair or replace a broken, defective, or worn-out part. If it cannot do this, but must rely on this subterfuge and unfair association and appropriation of plaintiff's name in order to sell its parts, that is unfair competition.

The only remaining questions to be decided are in regard to the two patents as to which direct infringement is claimed.

The first is the patent granted to Wollenweber, United States No. 1,669,888. This patent was applied for June 25, 1917, and relates to "an improved general assembly of igniter."

The structures manufactured and sold by defendant alleged to infringe this patent are the defendant's arms AU–1, 7, 8 and 17. Arm AU–1 is alleged to infringe claim 9; the others to infringe claim 11. (Defendant's Exhibit A, Exhibit L.) The difficulty here is that, in my opinion, there has been a failure of proof of title. Dowling et al. v. Jones (C. C. A. 2) 67 F.(2d) 537–540.

The law requires this proof. Rev. St. § 892, as amended (28 USCA § 673) and section 4898 (as amended 35 USCA § 47).

The alleged assignment offered in evidence is a certified copy of a Patent Office record. There is no proof of signature or acknowledgment. The patent issued to plaintiff. It appears from the evidence that the original assignment cannot be found. Plaintiff offered no other proofs, but rests its title on the proposition that issuance of the patent to it is prima facie evidence of title. Before plaintiff closed its case, defendants' counsel stated that he took the position that plaintiff had not proven title to this patent. Thereafter neither plaintiff nor defendants offered further proof as to the title of this patent.

It is unnecessary, therefore, to further consider this patent.

The remaining patent is Gilchrist, United States No. 1,735,112. This patent was applied for February 26, 1921. It was, however, not granted until November 12, 1929.

Plaintiff claims that defendant's switch SW–1 (Defendant's Exhibits D and S) infringes claims 1 and 4.

Gilchrist states that "an object of the invention is to provide a switch * * * which shall be simple, strong and durable and adapted to be manufactured in large quantities at a minimum expense." (Lines 4–8, page 1, of patent.)

Claims 1 and 4 are as follows:

"1. A switch for an automobile electric starter comprising a casing; a pair of spaced stationary contact members secured to the bottom thereof; a plunger mounted in the top of said casing movable toward said contact members; a single flat strip of conducting material having straight ends and being loosely carried at its center by said plunger for bridging said contact members when said plunger is moved, the contact faces of said members being inclined from their ends toward the axis of said plunger whereby when said plunger is moved, said strip yields gradually, increasing the area of contact with said members from their ends to the axis of said plunger."

"4. A switch for an automobile electric starter comprising a rectangular sheet metal casing; a sheet metal member forming the

top thereof; a pair of spaced stationary contact members secured to the bottom of said casing and extending therethrough; insulating means at either side of the bottom of said casing provided with openings of less dimension than the openings in said casing; a plunger mounted on the top of said casing; a single straight yieldable member of conducting material loosely carried by said plunger for bridging said contact members, when said plunger is moved toward said contact members, the contact faces of said members being inclined from the outer portion towards the axis of said plunger whereby when said plunger is depressed said bridging member yields and progressively increases the area of contact with said members from their outer ends to the axis of said plunger."

Defendant denies any such infringement by its switch SW–1, and calls attention to the prior art as exhibited in the patents granted to Charles Cuno, United States No. 1,378,660 and United States No. 1,429,326, the former applied for February 12, 1920, and patent granted May 17, 1921, the latter applied for February 12, 1920, and patent granted September 19, 1922. Both these patents state that the object of the inventor was "to provide a simple construction which will permit the switches to be economically and rapidly produced." (Lines 11–14, page 1, of first patent.) "To improve and cheapen the aforesaid construction without sacrifice to quality or efficiency." (Lines 11, 12, page 1, of second patent.)

Also the patents granted to Edward Halbleib et al., United States No. 1,238,667, applied for June 26, 1915, and granted August 28, 1917. Stephen F. Briggs et al., United States No. 1,336,066, applied for February 10, 1917, granted April 6, 1920, and to John J. Kuntz, United States No. 1,182,914, applied for July 9, 1914, granted May 16, 1916.

It seems to me it is sufficient to consider in this connection only the Cuno patents.

These Cuno patents, as has been stated, relate to an automobile starter switch with a bridging member comprising four laminations downwardly inclined at their ends. Cuno applied for his patent a year before Gilchrist, and, when the Gilchrist application came along, difficulty was met with in the Patent Office on account of Cuno, and the following claim made by Gilchrist was rejected on Cuno in the Patent Office and canceled: "2. In a switch, a sheet metal casing having a bottom and side walls, a sheet of insulating material in said casing extending across the bottom and up opposite side walls, stationary contact members secured to said bottom and separated therefrom by said sheet, a plunger carried by said casing, a conducting member carried by said plunger and adapted to bridge said contact members, said conducting member being guided by and insulated from said casing by said sheet of insulating material." (Defendant's Brief, page 91.)

Gilchrist, therefore, could not claim the benefit of this much broader claim which was rejected and canceled. Morgan Envelope Co. v. Albany Paper Co., 152 U. S. 425, 14 S. Ct. 627, 38 L. Ed. 500.

The idea of Gilchrist, therefore, to be considered is the idea of a bridging member made up of a flexible strip of metal carried at its center by a plunger by which it can be pressed down against the top surfaces of the contact parts, the contacts being first made by the ends of this bridging member, and then the further downward pressure flexes the bridging member against the upper faces of the contact, thus progressively increasing the area of contacts, and with counter result when the plunger is released, the ends of the bridging member being the last parts to separate from the contacts. This avoids the danger of arcing which damages the faces of the contact as well as the lower surfaces of the bridging member.

On the argument, counsel for plaintiff claims that novel features are the insulating of the contacts locating the terminal contacts, centrally insulating the bridging member, and the guiding of this member into proper engagement.

After an examination of defendant's switch which is claimed to infringe, it seems to me that it is more similar to Cuno than to Gilchrist.

Cuno's bridging member has four laminations which are not straight but are downwardly inclined at their ends. The defendant's switch has this bridging member comprising three laminations which are not straight but are downwardly inclined at their ends.

The purpose of both inventors as above indicated was to devise a simple construction and a cheaper one while in no way sacrificing the effectiveness of the mechanism; hence the defendant uses a laminated bridging member the same as Cuno, which requires more time and expense to make, and Gilchrist, after his encounter with Cuno's idea, changed his claims to "a single flat strip * * * having straight ends and a single straight yielding member."

Thus Gilchrist has only one piece to stamp out and to assemble as against defendant and Cuno.

It would seem to me that a bridging member and stationary contact faces and the flexibility of the bridging member appear in the prior art.

The idea of both Gilchrist and Cuno is based on a slight but different step in advance from a mechanical point of view.

■ It may well be that the Gilchrist switch is, mechanically and from a production point of view, a better switch, but the differences are so slight that I am unable to say that defendant in following Cuno infringes this idea of Gilchrist. Therefore, while Gilchrist is entitled to his claim of patentability for his idea, it does not seem to me that defendant infringes.

I find, therefore, the Gilchrist switch patent valid but not infringed.

■ Finally, on the proof in this suit, it is my opinion that the controversy is between the plaintiff and the defendant corporation, who are competitors in this industry. I fail to find any sufficient proof involving the personal liability of the individual defendants. They are the officers of the defendant corporation and acted as such, without proof, so far as I can find, that they acted in any other capacity or manner.

Thus the conclusions I have come to are as follows: The important contest between plaintiff and defendant is as to the respective rights of these corporations, in the automobile industry, in connection with the manufacturing and selling of certain small parts, old in the patent art, but used in patented combinations by plaintiff.

Defendant is alleged to be a contributory infringer of these patents, yet such infringement does not arise unless the owner of the automobile directly infringes. Such alleged infringement by the owner of the automobile must be considered in connection with the nature, wide use, comfort, and necessity of such owner.

The suit here by plaintiff seeks the relief from such alleged contributory infringement, not because of any particular direct infringement by the owner of an automobile, but because defendant's course of business naturally will induce such direct infringement by such owner. It may be possible under other circumstances and under the decisions to afford this relief in a patent suit on such grounds and because the parties are competitors. The defendant is not an owner of an automobile. It is, under such circumstances, what has been termed "a trespasser." Yet, having in mind what I believe to be the right of defendant to lawfully manufacture and sell such old parts, and likewise having in mind the comfort and necessity of an owner of an automobile, as well as the proper protection of plaintiff, I prefer to find, and do find, no contributory infringement by defendant requiring an injunction on that ground, but I find that plaintiff has proved sufficiently that defendant is unfairly competing in the industry with it and is entitled to a decree on that ground.

If this is correct, it means that a plaintiff such as this can obtain all the relief it is entitled to, without the necessity of the expense and labor and hazard of a patent suit in order to protect itself from unfair dealing.

The bill is dismissed, with costs as to the individual defendants, and without costs as to alleged contributory infringement, and with costs as to direct infringement of the two patents claimed to have been directly infringed. (As to Wollenweber, solely for failure of proof as to title.)

Plaintiff is entitled to a decree with costs forbidding defendant from continuing to unfairly compete with plaintiff in accordance with this opinion.